562 F.2d 1144
 2 Fed. R. Evid. Serv. 741
 UNITED STATES of America, Plaintiff-Appellee,
v.
Howard BROWN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frances NICKEL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert "Larry" MAYES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles MARTS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles McEVOY, Defendant-Appellant.
 Nos. 76-2925, 76-2933 and 77-2094, 76-2931 and 77-2101,
76-2930, 76-2932.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 6, 1977.
Amended Nov. 4, 1977.
Rehearing Denied Jan. 9, 1978.
As Amended Jan. 6, 1978.
 
 David F. Stobaugh and James L. Vonasch, Seattle, Wash., argued for defendants-appellants.
 Donald M. Currie, Asst. U. S. Atty., Seattle, Wash., argued for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Washington.
 Before CARTER and CHOY, Circuit Judges, and HOFFMAN,* District Judge.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is an appeal by five defendants of their convictions by a jury for conspiracy to distribute and possession with intent to distribute a controlled substance (heroin), in violation of 21 U.S.C. §§ 841(a)(1) and 846. Nickel and Mayes also separately appeal from the denial of their motions for a new trial.
 
 
 2
 Appellants argue that the trial court erred in permitting the jury to consider evidence of a dismissed possession charge without a cautionary instruction. They also contend that the government was obligated to disclose certain material facts about its principal witness. Marts, Mayes, and Nickel suggest that statements from one of the co-defendants were improperly received as evidence since they were made after the conclusion of the conspiracy. Brown argues that the government should have disclosed the identity of the informant prior to trial. McEvoy contends a chemical expert should have been appointed to examine heroin quality. Nickel lastly argues that the trial court should have granted discovery of certain records of the Bureau of Prisons under the Freedom of Information Act.
 
 
 3
 We affirm.
 
 Facts
 
 4
 During the months of January through March, 1976, appellants Marts and McEvoy were cellmates at McNeil Island Federal Penitentiary in Washington. Appellants Brown, Mayes, and Nickel were residents of California. Nickel is Marts' mother and Brown's aunt. Mayes resided with Nickel during this time, which was the period of the conspiracy charged in Count I of the indictment.
 
 
 5
 The first overt evidence of a conspiracy surfaced during a routine "shake-down" at McNeil on January 24, 1976. McEvoy was found to be in possession of a small quantity of heroin, which he attempted to hide during the search by throwing it to Marts.
 
 
 6
 In February, Brown, Mayes, and Nickel traveled from California to Tacoma. They unwittingly invited a government informant, Cindy Dickerson, along on the trip. During the trip, Dickerson learned that the three were taking a quantity of heroin up to Marts and McEvoy for the purpose of distributing it through Marts' "organization" in the prison. The three discussed the relative ease with which contraband could be smuggled into the facility by receipt from a relative in the visiting room.
 
 
 7
 Upon their arrival in Tacoma, Brown and Nickel discovered that one ounce of heroin was missing. An argument ensued in which Brown and Nickel accused Mayes of taking the heroin. Cindy Oyler, at whose residence the three were staying, overheard an argument regarding something which was missing, but did not hear what it was.
 
 
 8
 The remaining ounce of heroin was placed in balloons and taken to the institution the next day. The three appellants and Dickerson went to visit Marts and McEvoy with the balloons concealed in their undergarments. Once appellants were in the visiting room, the balloons were given to Marts, who in turn gave them to McEvoy. McEvoy then went to the restroom within the visiting room and concealed the balloons in his rectum. During this visit, appellants discussed the distribution of the heroin within the prison.
 
 
 9
 Mayes and Brown obtained another ounce of heroin while in Washington. This ounce was taken into the prison by Dickerson later in the week. Dickerson also accompanied Nickel to the prison to obtain money from Marts and McEvoy. Approximately $2,000 was received during the four day period. At the time of Nickel's arrest, she was in possession of over $1,000 in cash, including a $100 bill specifically identified by Dickerson.
 
 
 10
 Dickerson learned from Marts and McEvoy that they "stashed" their heroin in an empty coke can which appeared full and unopened. Dickerson described this "stash" and reported on her trip to officers when she arrived back in California. Based on this information, Marts' and McEvoy's cell was searched and 14 grams of heroin were found in a community locker. Inmate Ron Perrin testified at trial that the heroin was in fact his. Inmate Stanley Skakow corroborated this claim.
 
 
 11
 Appellants were indicted on May 18, 1976. Count I alleged a conspiracy between the five to distribute the heroin. Counts II and III alleged the substantive crimes of possession with intent to distribute. Count II was based on the January incident in the prison during which heroin was discovered on McEvoy. Count III was based on the March possession and transfer of heroin into the facility.
 
 
 12
 Trial began on July 19, 1976. At the close of the evidence, the court dismissed Count II of the indictment. The jury returned verdicts of guilty on the remaining counts for all defendants. Each defendant was sentenced to seven years imprisonment plus three years parole.
 
 Consideration of Count II Evidence
 
 13
 The original indictment charged defendants with two counts of possession of heroin with intent to distribute. Count II was based on the January 24, 1976, incident at McNeil in which heroin was found in McEvoy's possession. The government introduced substantial evidence during trial in support of this allegation, including the testimony of six government witnesses. At the close of evidence, the court dismissed Count II.
 
 
 14
 However, the court stated that the evidence admitted regarding Count II could be used by the jury in deciding Counts I and III. The jury was instructed as follows:
 
 
 15
 "For reasons which need not concern the jury, Count II has been withdrawn from your consideration. However, the evidence you heard relating to that count may be considered by you in your deliberations on the remaining counts."
 
 
 16
 Appellants Brown and McEvoy objected to this instruction.
 
 
 17
 Appellants argue that the court erred in permitting the jury to consider evidence on Count II. They claim that such evidence was highly prejudicial and irrelevant. The government counters, however, that the evidence was used to prove knowledge on the part of appellants, especially since Marts and McEvoy protested their ignorance of the heroin discovered in their cell.[1]
 
 
 18
 Rule 404(b) of the Federal Rules of Evidence provides:
 
 
 19
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 
 
 20
 This rule codifies prior case law. See Parker v. United States, 400 F.2d 248, 252 (9 Cir.), cert. denied, 393 U.S. 1097, 89 S.Ct. 892, 21 L.Ed.2d 789 (1968).
 
 
 21
 The rule represents one of inclusion which admits evidence of other crimes or acts relevant to an issue in the trial, except where it tends to prove only criminal disposition. United States v. Riggins, 539 F.2d 682, 682 (9 Cir. 1976). The question on appeal is whether the district court abused its discretion when it decided that the tendency of the evidence in question to prove the essential element of knowledge outweighed its potential prejudice. United States v. Perez, 491 F.2d 167, 172 (9 Cir.), cert. denied, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974).
 
 
 22
 Evidence showing that the inmates possessed heroin in January clearly tends to show that they knew about heroin found in their cell in March. On both occasions, the element in dispute is exactly the same: knowledge about heroin. Therefore, the important test of similarity is met. See United States v. Satterfield, 548 F.2d 1341, 1346 (9 Cir. 1977).
 
 
 23
 Recent decisions of this court have permitted the introduction of evidence of a prior similar act involving drugs to show knowledge and intent in the crime charged. See, e. g., United States v. Marshall, 532 F.2d 1279, 1283-84 (9 Cir. 1976); United States v. Marshall, 526 F.2d 1349, 1360-61 (9 Cir. 1975). Very recently, the court permitted the introduction of possession, which resulted in a prior acquittal to show knowledge in a marijuana case. See United States v. Rocha, 553 F.2d 615 (9 Cir. 1977). The admissibility of the evidence is thus clear.
 
 
 24
 The more problematical question in this case is whether the court did not go far enough in protecting against prejudice by giving a cautionary instruction on the limited use to which the evidence could be put. The court's instruction contained no limitation whatsoever.
 
 
 25
 Appellants are correct in observing that most cases approving the admissibility of evidence of other wrongs have pointed to the limiting instructions as important. However, none say that the evidence would not have been admissible but for the instruction. They say instead that such instructions reduced or eliminated the prejudice that might otherwise have occurred. See, e. g., United States v. Buck, 548 F.2d 871, 877 (9 Cir. 1977); United States v. Marshall, supra, 532 F.2d at 1283; United States v. Marshall, supra, 526 F.2d at 1360-61. The giving of a limiting instruction is but one factor in deciding whether there has been an abuse of discretion.
 
 
 26
 This case is different from the usual one where evidence of an entirely separate crime is admitted. Here the evidence was of one of the counts in the indictment itself. The jury could not have been misled about the effect of the evidence, as it only could be used to show some collateral element of the remaining counts. Appellants point out that the credibility of Dickerson was the key factor in this case. Evidence of knowledge about the heroin did no more than corroborate what Dickerson said, and was not the sole evidence of knowledge.
 
 
 27
 We believe that the highly probative nature of the evidence outweighs the possibility for prejudice. In United States v. Riggins, supra, 539 F.2d at 683, the court said: "But relevance is the essential criterion." The court in Riggins did not discuss the presence or absence of a limiting instruction. While such an instruction is an important factor, it is not a determinative one. Here the failure to give such an instruction does not constitute reversible error.[2]
 
 Statements by Brown
 
 28
 Appellants object to the admission of certain statements made by Brown after the term of the conspiracy had ended. They claim that these are hearsay which does not fall into the coconspirator exception to the hearsay rule. However, Brown's statements could not have been used to prove their own truth, but rather to show Brown's state of mind. Brown sought to avoid being accused in court, and thus asked Cindy Oyler not to "hurt him." The contents of these statements were not important; what that content shows was. Therefore, the statements were properly admitted for non-hearsay purposes. See United States v. Testa, 548 F.2d 847, 851-52 (9 Cir. 1977).
 
 Disclosure of Informant's Identity
 
 29
 Brown argues that the identity of the informant should have been disclosed to the defense prior to trial. The government resisted disclosure because it feared for the informant's safety, and the district court refused to compel such disclosure. However, unlike those cases cited by Brown, the informant eventually testified at trial. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), dealt with a refusal by the government to disclose the informant's identity at any time.
 
 
 30
 Roviaro noted that whether to disclose an informant's identity involves a balancing of the needs of law enforcement against the individual's interest in having a fair trial. The Court said each case must be viewed on its own particular facts. Id. at 62. See also United States v. Rawlinson, 487 F.2d 5, 7 (9 Cir. 1973), cert. denied, 415 U.S. 984, 94 S.Ct. 1579, 39 L.Ed.2d 881 (1974). Here the equation must consider the danger to the informant against delay in disclosure to the defendants.
 
 
 31
 The decision whether to compel disclosure of an informant's identity at all is within the trial court's discretion. United States v. Anderson, 509 F.2d 724, 729-30 (9 Cir. 1974), cert. denied, 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975). Since the court might have been justified under the circumstances to refuse to compel disclosure at all, it was well within its discretion to refuse to compel disclosure earlier than actually occurred. See United States v. Toral, 536 F.2d 893, 897 (9 Cir. 1976).
 
 Disclosure of Material Information
 
 32
 The government's chief witness was Dickerson, an 18-year-old paid informant of the Downey Police Department. Her testimony regarding the activities of defendants at McNeil established the existence of a conspiracy. When Dickerson returned to California from Washington, she gave a 65 page statement to Downey police and the DEA which became the basis for her testimony.
 
 
 33
 Each defense attorney was given a document containing pages 22 to 65 of that statement. Defendants moved for production of material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1965), but the government declined to release anything more. In fact, the first 21 pages of Dickerson's statement contained untrue statements. Dickerson had fabricated certain drug transactions she claimed to have made with Brown.
 
 
 34
 After the trial in this case, Mayes was tried in a Washington state court on a murder charge. Dickerson again testified. But this time she admitted to having lied in her initial statement to the Downey police. She admitted to having committed perjury before the federal grand jury regarding the length of time she had known Brown.[3] She said her motive was to make herself credible so that she could work with the police.
 
 
 35
 This court must assume that the government was aware of these untruths prior to the trial in this case. But the standard to be applied on appeal does not turn on this knowledge. As the Supreme Court said in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976):
 
 
 36
 "Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in the file, he should be presumed to recognize its significance even if he has actually overlooked it." At 110, 96 S.Ct. at 2400.
 
 
 37
 See also Brady v. Maryland, supra, 373 U.S. at 87, 83 S.Ct. 1194.
 
 
 38
 In Agurs, the Court discusses the prosecutor's obligation to disclose evidence in his possession that would be material to the defense. The standard to be applied to determine how material the evidence has to be to require disclosure varies in three described situations, where:
 
 
 39
 1. The prosecution used perjured testimony; or
 
 
 40
 2. The defense requested specific evidence; or
 
 
 41
 3. The defense made no request, or only a general one, for exculpatory material.
 
 
 42
 Appellants argue that this case falls into the first category, where convictions must be set aside if there is any reasonable likelihood that false testimony could have affected the judgment of the jury.
 
 
 43
 But the first category is limited to cases where perjured testimony is given at the trial itself. See, e. g., Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States v. Sutton, 542 F.2d 1239, 1241 (4 Cir. 1976). This case involves the nondisclosure of impeachment evidence. It does not fall into the first category of Agurs.[4]
 
 
 44
 A recent decision of this court supports this conclusion. In United States v. Lasky, 548 F.2d 835 (9 Cir. 1977), one of the government's witnesses in a cocaine prosecution answered the questions propounded to him on cross-examination in such a way as to conceal additional drug-related activities. The court found the questions equivocal enough so that the answers were not directly false. It also applied the least strict Agurs standard to evidence of these activities which was not disclosed. Id. at 839.
 
 
 45
 In United States v. McCrane, 547 F.2d 204 (3 Cir. 1976), the Third Circuit also rejected placing a similar case in Agurs' first category. There letters written by the prosecutor to one of the government's key witnesses were not disclosed after a request for impeachment materials. The court held that the request was specific and therefore applied the standard of Agurs' second category.
 
 
 46
 The question remains which standard is appropriate. Defendants made only a general request for "Brady material" prior to trial. The case is therefore the same as Agurs itself, where the court found a general request to have the same effect as no request at all.[5] The standard of materiality in such cases is whether the " 'omitted evidence creates a reasonable doubt that did not otherwise exist.' " United States v. Agurs, supra, 427 U.S. at 112, 96 S.Ct. at 2403.
 
 
 47
 Applying this standard, we conclude that the undisclosed evidence would not have created "a reasonable doubt that did not otherwise exist." Although Dickerson was the key government witness, appellants received an opportunity for extensive cross-examination of Dickerson. See Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). They showed that she had been arrested for prostitution, she had been paid as an informant, she had used narcotics, and that she had lied to narcotics agents about the length of time she had known Brown. Much of the undisclosed evidence therefore would have been merely cumulative. Moreover, some of Dickerson's testimony was corroborated.
 
 
 48
 It is arguable that we need not reach the applicability of Brady-- and the more recent standard for assessing the materiality of allegedly exculpatory omitted evidence enunciated in Agurs-- because here the defense was not, in fact, prevented from examining undisclosed statements. Nickel's attorney admitted during oral argument that he was in possession of the undisclosed 21 pages of transcript before trial and that he believed the attorneys for all other defendants also had copies of the missing pages. Mayes' attorney confirmed that he, too, had the missing pages. Furthermore, counsel for Nickel also admitted that he discussed the transcript with the other defendants' attorneys, although in his petition for rehearing he contends this discussion was not until after the trial during an appeals conference.[6] An analysis of these pages among co-defendants' counsel certainly would have revealed the lies contained in them. Thus possession is tantamount to knowledge that the transcript contained lies.
 
 
 49
 Likewise, a review of the cross-examination of Dickerson at trial reveals that defense counsel had in front of them copies of her testimony before the grand jury. Since it was known by defense counsel and even brought out at trial that Dickerson had lied to the Downey police about the length of time she had known Brown, this same lie in the grand jury transcript should have been apparent. Counsel must have known of this discrepancy or overlooked it.
 
 
 50
 The attorneys could have rectified the entire matter by informing the court of their knowledge of the untruths in Dickerson's various statements and cross-examining Dickerson about them. Instead they either negligently failed to discover and utilize information in their own possession or deliberately withheld vital information from the trial court as a ploy for a new trial or appellate reversal. In either event, defense counsel will not be heard on appeal complaining about the failure of the prosecution to disclose this very information.[7]
 
 Appointment of Expert
 
 51
 McEvoy made a motion before trial for the appointment of an expert to examine the quality of the heroin found in his cell. He argues that the quality of a drug is an important indicator of the likelihood that it will be distributed, so that the denial of this motion was error.
 
 
 52
 In fact, the DEA laboratory did conduct an analysis of the drug and these results were admitted into evidence. The analysis showed that the drug could have been distributed. McEvoy argued at trial that the quality was inadequate for distribution, but this argument was obviously rejected by the jury. Moreover, evidence of the quantity of a drug may be sufficient to support an inference of intent to distribute. See United States v. Ramierez-Rodriquez, 552 F.2d 883 (9 Cir. 1977), (large quantity of heroin in prison sufficient to show intent to distribute).
 
 Discovery of Bureau of Prisons' Records
 
 53
 Nickel moved before trial for discovery of the Bureau of Prisons' records of Marts and McEvoy (and co-defendant Sanchez), claiming access under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). This request was made under rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure rather than the procedure for the Bureau of Prisons outlined at 28 C.F.R. § 16.1 et seq.
 
 
 54
 The district court denied the motion on the grounds that FOIA is not applicable to discovery in a criminal trial, so that Nickel had to exhaust her administrative remedies before turning to the district court. With this conclusion we disagree. It would impose a needless and time-consuming burden on a defendant in a criminal trial to require a separate civil action for disclosure under FOIA. Moreover, this circuitous route would require postponement of the criminal proceeding until the defendant either obtained or was denied the information sought. The application of the Freedom of Information Act can be determined by the district court in the pending criminal action just as readily as by a district court in a separate civil suit. Judicial economy and basic fairness mandate the district court to hear and rule upon the claim under FOIA. See United States v. Wahlin, 384 F.Supp. 43, 47 (W.D.Wisc.1974).
 
 
 55
 Was the material sought indeed discoverable under FOIA? The government argues that such prison records are protected under the Privacy Act of 1974, 5 U.S.C. § 552a, which provides in relevant part:
 
 
 56
 "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ."
 
 
 57
 But this provision contains several exceptions. Included in these exceptions are provisions which require disclosure if the material is required to be released under § 552 (FOIA) or if it is ordered released by a court. 5 U.S.C. § 552a(b)(2) and (11). Either or both of these exceptions apply in this case. Therefore, the Privacy Act does not prevent discovery. See Christy v. United States, 68 F.R.D. 375, 378 (N.D.Tex.1975) (records of prisoner discoverable under FOIA and not protected by Privacy Act).
 
 
 58
 Since the materials should have been produced, then, the final inquiry is whether Nickel has made out a showing of prejudice from the court's failure to do so.[8] Nickel claims that she wanted to learn whether Dickerson had visited Marts or McEvoy before to determine "whether the informant may have entrapped the other defendants or whether she may have been operating in colusion (sic) with Nickel's co-defendants." This information would not have helped Nickel. The number of visits by Dickerson could not possibly show entrapment or collusion. Moreover, appellants disclaim knowing that Dickerson was the informant at all until she testified at trial.
 
 
 59
 Nickel also sought the records to determine if either Marts or McEvoy had institutional histories of drug use and, if so, what adjudicatory steps had been taken against them. This evidence is no doubt relevant to show whether the inmates had possessed heroin on previous occasions. However, evidence of prior possession was admitted and considered by the jury. Further evidence of possession would have been cumulative.
 
 
 60
 Although Nickel alludes to "other examples" of the potential uses of these prison records, none others are specified. No showing of prejudice, therefore, has been made. Lacking such prejudice, the error of the district court in failing to order discovery of the Bureau of Prisons' records was harmless.
 
 Conclusion
 
 61
 The judgments of the district court are AFFIRMED.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior United States District Judge, Eastern District of Virginia, sitting by designation
 
 
 [1]
 The government argues in relation to this issue that the "plain error" rule applies because only one defendant objected to the judge's instruction. In fact, both Brown and McEvoy excepted. In any event, it is established that when one codefendant objects and thereby brings the matter to the attention of the court, further objections by other defendants are unnecessary. See United States v. Bagby, 451 F.2d 920, 927 (9 Cir. 1971)
 
 
 [2]
 Our holding today should not be viewed as sanctioning the failure to give such cautionary instructions. We decide only that the failure to give an instruction under the circumstances of this case does not constitute reversible error. We believe the district judge should have given an instruction, however
 
 
 [3]
 Defendants might have challenged the federal indictment in this case under United States v. Basurto, 497 F.2d 781 (9 Cir. 1974), which holds:
 '. . . the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached.' Id. at 785.
 In spite of the fact that defendants have effectively waived this argument by failing to mention it either at trial or on appeal, we feel it deserves some mention.
 Basurto does not lay down a per se rule that all perjury before a grand jury is fatal to the indictment. The perjury must be material. See United States v. Kennedy, 564 F.2d 1329, 1338 (9 Cir. 1977). For example, in Basurto the witness admitted that all his grand jury testimony relating to his knowledge of appellants' activities in a charged conspiracy before a critical date was untrue.
 In this case Dickerson told only one relatively insignificant untruth. She claimed to have known one of the defendants for five years when actually she had known him for only five months. This lie arguably could have bolstered Dickerson's credibility but not substantially. Her testimony centered around events which had occurred in her presence, not requiring a lengthy friendship or acquaintance to be believable. Thus her perjury was not material. The indictment would withstand a timely Basurto challenge.
 
 
 [4]
 It is possible to interpret Agurs more broadly. The operative language is as follows:
 "(T)he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. It is this line of cases on which the court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." 427 U.S. at 103-104, 96 S.Ct. at 2397.
 It is possible to focus on the language "corruption of the truth-seeking function of the trial process," in which case the nondisclosure here and in many instances would be included. We believe, however, that Agurs' first category concerns only "the knowing use of perjured testimony." The broader interpretation could include any evidence pertaining to the credibility of any witness, and would effectively swallow up the other categories. Clearly the strict standard of this first category was not meant to be so broad.
 
 
 [5]
 The court stated:
 "In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all, or possibly ask for 'all Brady material' or for 'anything exculpatory.' Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for 'Brady material' has been made.
 427 U.S. at 106, 96 S.Ct. at 2399. See also United States v. Lasky, supra, 548 F.2d at 839.
 
 
 [6]
 After this opinion was initially filed it was amended. Appellants Nickel and Mayes filed petitions for rehearing objecting to the amendment. The petitions made numerous assertions of error centering around the Brady-Agurs issue and the Basurto issue (see footnote 3) discussed in this subsection. The petitions have been denied
 Appellants' several claims are answered in this final version of the opinion.
 
 
 [7]
 Appellants Nickel and Mayes also argue that the district court should have granted their motion for a new trial because of the prosecution's failure to reveal that Dickerson lied to the police and grand jury. Appellants admit, however, that the Agurs' standards apply to a motion for new trial as well as appellate reversal. Therefore, our conclusions on this issue dispose of their new trial contention as well
 
 
 [8]
 Nickel correctly observes that no showing of materiality is needed for production under FOIA. But her motion for discovery is in a criminal trial under Fed.R.Crim.P. 16. Clearly both materiality of the evidence and harm from failure to produce must be shown to warrant reversal