577 F.2d 690
 3 Fed. R. Evid. Serv. 621
 UNITED STATES of America, Plaintiff-Appellee,
v.
Kenneth Wayne WALLS, Defendant-Appellant.
 No. 77-2089.
 United States Court of Appeals,
Ninth Circuit.
 June 28, 1978.
 
 Morris Lavine, Los Angeles, Cal., for defendant-appellant.
 Michael D. Hawkins, U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.
 Appeal from the United States District Court for the District of Arizona.
 Before BARNES and CHOY, Circuit Judges, and LYDICK,* District Judge.
 BARNES, Senior Circuit Judge:
 
 
 1
 The appellant, Kenneth W. Walls, was convicted by a jury in the District Court of Arizona on two counts. The first count charged the appellant with devising a scheme or artifice to defraud Violet Bjerke, by causing a quitclaim deed executed by him to be sent through the United States Postal Service on or about January 24, 1972 from Calaveras County, California, to Arizona, in violation of 18 U.S.C. §§ 1341[1] and 2.[2] The second count charged appellant with transporting from Alaska and Arizona $10,000 in interstate commerce on or about December 20, 1971, in violation of 18 U.S.C. §§ 2314[3] and 2. Appellant was sentenced to five years in prison and a $5,000 fine with the further order that "defendant stay committed until said fine be paid." (CT 156).
 
 
 2
 We have jurisdiction. 28 U.S.C. §§ 1291 and 1294(1). The district court had original jurisdiction. 18 U.S.C. § 3231.
 
 
 3
 Appellant raises twenty-one issues on appeal. We reduce them to the six suggested by the government and conclude that none of appellant's contentions warrant reversal.
 
 I. FACTS
 
 4
 We adopt a modified and enlarged form of the government's statement of facts, which is more precise and accurate than that offered by appellant.[4]
 
 
 5
 Appellant allegedly made false representations to obtain $20,000 from Mrs. Violet Bjerke. The misrepresentations concerned his claimed ownership and the mineral productivity of property in California which induced Mrs. Bjerke to loan appellant $20,000 on a short-term basis. The loan was never repaid. Federal jurisdiction was obtained when the quitclaim deed was filed in California and returned to Arizona by use of the mails, and when appellant cashed Mrs. Bjerke's Alaska State Bank check in Arizona.
 
 
 6
 In December of 1971, appellant approached Violet Bjerke in Scottsdale, Arizona, about investing in a gravel pit and gold mining operation appellant claimed to have underway in Calaveras County, California. (RT 45-46). Appellant had tried unsuccessfully to interest Mrs. Bjerke in his investments on several prior occasions. (RT 45).
 
 
 7
 Appellant claimed to be getting gold out of the gravel pit and showed Mrs. Bjerke nuggets he claimed were taken from the operation. (RT 57). Mrs. Bjerke agreed to invest $20,000 in appellant's venture. In return, appellant executed on December 20, 1971 a promissory note, promising to pay her $25,000 "no later than January 2, 1972." As purported security, appellant gave Mrs. Bjerke a quitclaim deed to the mineral rights in the gravel pit/gold mine. (RT 49-52).
 
 
 8
 Relying on appellant's statements, the promissory note and the security therefor, Mrs. Bjerke gave appellant two checks on December 20, 1971, one drawn on her Alaska bank account in the amount of $10,000 (RT 58; Gov. Exh. 3), and another $10,000 check drawn on an Arizona bank. (RT 59; Gov. Exh. 4).
 
 
 9
 The local check was cashed the same day; the Alaska check was endorsed and presented to the local bank the same day (apparently to be applied on Loan No. 42-11135), and was paid by the Alaska bank on December 27, 1971. By cashing the $10,000 check drawn on the Alaska State Bank, appellant caused the Alaska State Bank to withdraw $10,000 from Mrs. Bjerke's account. The Arizona Bank in Phoenix received the $10,000 from the Alaska State Bank through the Federal Reserve System. (RT 121-123).
 
 
 10
 Appellant represented to Mrs. Bjerke that he would use the money to develop the gold mine in Calaveras County. Mrs. Bjerke never received any money in return. Appellant left the Phoenix area in February, 1972. (RT 60).
 
 
 11
 After making the loan, Mrs. Bjerke became concerned over her investment with the appellant and ultimately had the quitclaim deed mailed to Calaveras County, California, for recording, but not until January 24, 1972. She received the deed back from the county recorder's office in the mail. (RT 52-53). Recorded instruments are mailed out by the county recorder in the ordinary course of business. (RT 80-81).
 
 
 12
 The parcel in question is between three and five acres and is part of a larger forty-acre parcel which apparently had a fair market value ranging from $18,760 (as of May, 1970) to $30,030 (as of November, 1973). (RT 104, 105). The Calaveras County Assessor has no information that the parcel in question has ever produced commercial quantities of gold. (RT 106).
 
 
 13
 No record of appellant's ownership of Lot 4, Block 1, Douglas Flat Townsite (the mineral rights of which appellant gave Mrs. Bjerke as security) exists in the official records of Calaveras County. (RT 90). At the time of appellant's representations to Mrs. Bjerke (December, 1971), record title was in the name of one Moheng. (RT 91). Title to the parcel after January 2, 1972 was in the name of Harley R. Walls and Margaret Petts Walls (appellant's parents), pursuant to a grant deed dated December 13, 1971 but not recorded until January 7, 1972. (RT 90). When the appellant gave Mrs. Bjerke the quitclaim deed, he had nothing to give. (RT 91, 95).
 
 
 14
 In sum, when appellant Kenneth W. Walls took the $20,000 in checks from Mrs. Bjerke on December 20, 1971, and issued his note to her for $25,000 payable in January 2, 1972, he had no title to the land, or the mineral rights which he purported to assign. Furthermore, we note that, on December 20, 1971, only Item 1 of the various deeds (see note 4, supra ) was recorded in Calaveras County, where the property was located.
 
 
 15
 At trial, the defense called Ted Purinton, who testified that he loaned appellant $20,000 in January, 1972, and was present, within sight, when appellant paid Mrs. Bjerke an unknown amount of money by counting the cash out to her on the hood of his car at 5:00 p. m. on the side of a road in Scottsdale, Arizona. (RT 168-169). This scenario was flatly denied by Mrs. Bjerke. (RT 258). Purinton stated that appellant had told him he needed the $20,000 to buy a rock plant. (RT 171).
 
 
 16
 Appellant's father, Harley Walls, testified for the defense that he purchased the property in Douglas Flat for $134,000 on September 1, 1971 from the previous owners. (RT 226). Walls further testified that he paid $3,000 down, the balance to be paid pursuant to an agreement of sale. (RT 227). Apparently, this 4.2 acre parcel contained a rock crusher plant and equipment. (RT 231).
 
 
 17
 For some reason, however, Harley Walls did not obtain the deed to this property until a subsequent transaction occurred between Walls and the previous owners in December, 1971. (RT 243). Walls testified that, at this latter transaction, he paid $40,000 for the forty-acre parcel of which Lot 4, Block 1, is a subparcel. (RT 242). He had two liens on the property. (RT 242). In his testimony, Harley Walls claimed to have worked the gravel pit on the forty-acre parcel prior to having it deeded to him on December 13, 1971. (RT 244). He also stated that the entire venture was abandoned in the latter part of 1972. (RT 244-245).
 
 
 18
 Harley Walls further testified that on September 23, 1971, he gave his son (the appellant) a general power of attorney and a quitclaim deed to the mineral rights to the property purchased from the Mohengs. (RT 232-233, 235, 238). However, no such quitclaim deed was produced (RT 237), and Harley Walls admitted that he never recorded either the quitclaim deed or the power of attorney. (RT 239). The power of attorney in evidence was neither witnessed nor acknowledged (Def. Exh. A), and of course, never recorded.
 
 II. ISSUES[5]
 
 19
 A. Was use of the mails and cashing of the Alaska check sufficient to bring appellant's transactions within either or both of the statutes charged in the indictment?
 
 
 20
 B. Was there sufficient evidence for the trier of fact to find appellant guilty?
 
 
 21
 C. Is an indictment signed only by an Assistant United States Attorney sufficient under Fed.R.Crim.P. 7?
 
 
 22
 D. Did the district court err in admitting evidence of other similar loan transactions by the appellant and failing to instruct the jury on the limited use to be made of such evidence?
 
 
 23
 E. Was it error for the district court to meet with a juror in chambers, in the presence of both counsel and with their consent, but in the absence of appellant? If so, was the error harmless?
 
 
 24
 F. Did the appellant receive effective assistance of counsel?
 
 A. USE OF THE MAILS
 
 25
 At the outset, appellant makes what is essentially a jurisdictional argument that use of the mails was insufficient in this case to give federal authorities jurisdiction to prosecute. As to Count I, appellant contends that neither Mrs. Bjerke's mailing the deed to California for recording nor the Calaveras County Recorder's mailing of the recorded quitclaim deed to Mrs. Bjerke (these being the only mailings upon which to base federal jurisdiction in this count) was for the purpose of executing a scheme to defraud as required by 18 U.S.C. § 1341. As to Count II, appellant claims there is no evidence that appellant transported or caused to be transported $10,000 from Alaska to Arizona and that, therefore, the jurisdictional requirement of interstate commerce in 18 U.S.C. § 2314 was not met.
 
 
 26
 B. SUFFICIENCY OF THE EVIDENCE AS TO COUNT II
 
 
 27
 Viewing the evidence, as we must, in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it is clear that appellant misrepresented the validity of the quitclaim deed which Mrs. Bjerke relied on for security when agreeing to loan appellant $20,000, including the $10,000 drawn on the Alaska bank.[6] It is unquestionable that appellant then deposited in an Arizona bank a $10,000 check drawn on an Alaska bank, thereby causing the Alaska bank to transfer funds to Arizona. Such a deposit, when taken by fraud, is within the prohibition of 18 U.S.C. § 2314 despite the fact that the mails may not have been used and the check cashing may not have been in furtherance of a scheme to defraud. United States v. Willis, 528 F.2d 381 (9th Cir. 1976); United States v. Gundersen, 518 F.2d 960 (9th Cir. 1975). Thus, the jury could reasonably have concluded that appellant both obtained $10,000 by fraud[7] and then caused that amount to be transported in interstate commerce in violation of § 2314. The evidence was therefore sufficient to convict appellant on Count II. United States v. Coplen, 541 F.2d 211, 216 (9th Cir. 1976).
 
 C. SIGNATURE ON THE INDICTMENT
 
 28
 Appellant attacks the indictment on grounds that it was signed by an Assistant United States Attorney and not by the "attorney for the government" as required by Fed.R.Crim.P. 7(c)(1). We hold, however, that the signature of the United States Attorney himself was not essential and that the signature of an Assistant United States Attorney was sufficient to indicate the necessary agreement of the United States Attorney with the action taken by the grand jury. United States v. Wright, 365 F.2d 135, 137 (7th Cir. 1966), cert. denied, 386 U.S. 918, 87 S.Ct. 879, 17 L.Ed.2d 789 (1967); Abramson v. United States, 326 F.2d 565, 567 (5th Cir.), cert. denied, 377 U.S. 957, 84 S.Ct. 1636, 12 L.Ed.2d 500 (1964).
 
 D. EVIDENCE OF SIMILAR LOAN TRANSACTIONS
 
 29
 Evidence of other loan transactions in which appellant had defaulted was submitted by the government to rebut appellant's claim that he borrowed from Mrs. Bjerke in good faith.[8] Under Fed.R.Evid. 404(b), evidence of other acts is admissible to show the knowledge and intent, and therefore, the lack of good faith, with which appellant acted. United States v. Moore, 522 F.2d 1068, 1079 (9th Cir. 1975), cert. denied, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). Whether the danger of prejudice from admission of such evidence outweighs its probative value is committed to the trial court's sound discretion. United States v. Nichols, 534 F.2d 202, 204 (9th Cir. 1976). Under the circumstances, we cannot say that the trial judge abused his discretion in admitting the other transactions which, in our opinion, were sufficiently similar to the charged offense to be probative of a common plan, scheme, design, system, or course of conduct. See Parker v. United States, 400 F.2d 248, 251-252 (9th Cir.), cert. denied,393 U.S. 1097, 89 S.Ct. 892, 21 L.Ed.2d 789 (1968) (criteria for reviewing admission of similar transactions).
 
 
 30
 Furthermore, the failure of the trial court, on its own motion, to give a specific jury instruction on the use to be made of these similar transactions, when properly viewed in the light of the case as a whole (United States v. Park, 421 U.S. 658, 674-676, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975)), was not unduly prejudicial. Although it would have been preferable to give an instruction which carefully limited the jury's use of the similar transactions,[9] (see, e. g., United States v. Brown, 562 F.2d 1144, 1148 (9th Cir. 1977); United States v. Moore, supra, 522 F.2d at 1079), we cannot say that failure to give such an instruction sua sponte was an abuse of discretion particularly where, as here, there was no request by defense counsel for the specific instruction. See United States v. Park, supra, 421 U.S. at 676, 95 S.Ct. 1903 (failure to request particular instruction considered as factor). See also United States v. McSweaney, 507 F.2d 298, 301 (9th Cir. 1974) (failure to give accomplice instruction sua sponte not reversible error). The jury instructions, taken together, focused the jury's attention on its duty to consider only the crimes charged in the indictment solely in the light of evidence tending to prove the necessary elements of those crimes. See United States v. Sambrano, 505 F.2d 284, 287 (9th Cir. 1974) (instructions, though not in precise language requested by counsel, sufficiently focused jury's attention on issue of identity); United States v. Fritts, 505 F.2d 168, 169 (9th Cir. 1974), cert. denied, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975) (failure to give cautionary accomplice instruction not reversible error); United States v. Campbell, 507 F.2d 955, 958 (9th Cir. 1974) (failure to give desired instruction was not plain error in light of fair and neutral statements made by trial judge and otherwise detailed and accurate instructions).
 
 
 31
 While the failure to give a limiting instruction is an important factor, it is not determinative. United States v. Brown, supra, 562 F.2d at 1148. Here the failure to give such an instruction was not reversible error. See United States v. James, 576 F.2d 223 at 226-227 (9th Cir. May 12, 1978), slip op'n at 1537; United States v. Brown, supra.
 
 E. MEETING WITH JUROR IN CHAMBERS
 
 32
 Appellant contends that his right to be present at all stages of the criminal proceeding was infringed when the trial judge held a conference, in chambers and on the record, with a juror and both counsel. (RT 315-318). At that conference, Juror D. K. Bruhn, who requested the meeting, complained that "we (presumably the jury) have been had" because "the (use of) the mails in this case are a strictly secondary point. He (the appellant) had no control over it." (RT 316). In response, the trial judge maintained strict neutrality.[10] Juror Bruhn then suggested the possibility of declaring a mistrial to which the trial judge responded with similar neutrality.[11] The judge then asked counsel if they wished to add anything else to the record of this conference. No objections were raised. (RT 318).
 
 
 33
 The general rule is that both the defendant and his counsel have the right to be present at all stages of the trial, from arraignment to verdict and discharge of the jury. Fed.R.Crim.P. 43; Rogers v. United States, 422 U.S. 35, 38-39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); Polizzi v. United States,550 F.2d 1133, 1137 (9th Cir. 1976). However,
 
 
 34
 the existence of a right to be present depends upon a conclusion that absence could, under some set of circumstances, be harmful. Due process does not assure "the privilege of presence when presence would be useless, or the benefit but a shadow." Snyder v. Massachusetts, 1934, 291 U.S. 97, 106-107, 54 S.CT. 330, 332, 78 L.Ed. 674 (Cardozo, J.)
 
 
 35
 Polizzi v. United States, supra, 550 F.2d at 1138. Thus, a failure to comply with the presence rule does not call for automatic reversal.
 
 
 36
 (E)ven improper exclusion of a defendant from a "critical" portion of the trial does not automatically require reversal, if in the particular case the defendant's absence was harmless beyond a reasonable doubt. (Citations omitted.)
 
 
 37
 Polizzi v. United States, supra, 550 F.2d at 1138.
 
 
 38
 In the instant case, the trial judge gave Juror Bruhn no information which could have influenced the guilty verdict ultimately returned by the jury. Indeed, the trial judge went so far as to assure Bruhn that if he believed in appellant's innocence, he could continue to vote his conscience because a mistrial due to a hung jury was not an uncommon occurrence. (RT 318). The conference was held in the presence of appellant's counsel and was placed on the record. No objection to the propriety of the conference was raised although appellant's counsel was given an explicit opportunity to do so. (RT 318). Under these circumstances, the absence of appellant from the in-chambers conference was not critical and, even if erroneous, was harmless beyond a reasonable doubt.
 
 
 39
 Appellant also charges that it was error for the trial judge to refuse defense counsel permission to ask the foreman of the jury if Juror Bruhn had made any comments to the jury about his conference in chambers. (RT 321). This was not error. Nothing said at that conference was prejudicial and defense counsel waived objection to Juror Bruhn's returning to the deliberations. Furthermore, permitting inquiry into whether the in-chambers conference was discussed by the jury could well have involved the jurors in an impermissible effort to impeach their own verdict.[12] See, Fed.R.Evid. 606(b); United States v. Weiner, 578 F.2d 757 at 764 (9th Cir. 1978), slip op'n at 1584.
 
 F. EFFECTIVE ASSISTANCE OF COUNSEL
 
 40
 The standard for measuring effective assistance of counsel is a matter of some uncertainty in this Circuit pending the en banc decision in Cooper v. Fitzharris, 551 F.2d 1162 (9th Cir. 1977), petition for rehearing en banc granted July 5, 1977. At one end of the spectrum lies the traditional farce or mockery test. 551 F.2d at 1165. At the other end lies the standard adopted in Cooper of failure to render reasonably effective assistance. 551 F.2d 1166. We are convinced that, despite appellant's objections, defense counsel would be considered to have rendered effective assistance under any test which this Court may ultimately choose. For example, appellant argues that he is entitled to a judgment of acquittal because his counsel failed to object when the prosecution was permitted to introduce a photostat, rather than the original, of the quitclaim deed given to Mrs. Bjerke as security for her $20,000 loan to appellant. But, absent any genuine question as to the authenticity of the original, the photostat was properly admitted. Fed.R.Evid. 1003. Appellant also claims that defense counsel should have demonstrated to the jury that appellant had never been in Alaska and therefore could not have transported $10,000 from Alaska to Arizona. However, as previously discussed, depositing the Alaska check in an Arizona bank created sufficient interstate commerce to bring appellant's actions within the prohibition of 18 U.S.C. § 2314.
 
 
 41
 Appellant's other claims of attorney misfeasance are equally without merit. Appellant's Sixth Amendment rights were not violated.
 
 
 42
 We need not reach appellant's arguments regarding Count I. This Circuit follows the concurrent sentence doctrine of Benton v. Maryland, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), under which a federal appellate court, as a matter of discretion, may decide that it is unnecessary to consider arguments advanced by an appellant with regard to his conviction under one count of an indictment if he was validly convicted under another count and concurrent sentences were imposed. United States v. Moore, 452 F.2d 576, 577 (9th Cir. 1971). Whether this Court decides that consideration of certain arguments is unnecessary under the concurrent sentence doctrine depends upon the determination, in the exercise of the Court's discretion, that the convictions which would not be examined will not entail adverse collateral legal consequences for the appellant. Id.
 
 
 43
 Appellant was sentenced to five years on each of two counts, the sentences to run concurrently. (CT 156). A $5,000 fine was imposed only as to Count II. Appellant has not suggested, and we do not perceive any collateral legal consequences adverse to appellant, over and above those flowing from his conviction on Count II, will result if the conviction on Count II is allowed to stand without appellate review. We accordingly decline, in the exercise of our discretion, to consider appellant's arguments insofar as they are directed solely to Count I of the indictment.
 
 CONCLUSION
 
 44
 The judgment as to Count II is affirmed. In the exercise of our discretion, we decline to consider appellant's arguments directed solely to the conviction under Count I. The Clerk will issue the mandate forthwith. Enlargement on bail is revoked now if appellant is still on bail. No petition for rehearing will be entertained. See Fed.R.App. p. 2.
 
 
 
 *
 Honorable Lawrence T. Lydick, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 § 1341. Frauds and swindles
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places . . . any matter or thing whatever to be sent or delivered by the Postal Service, . . . or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 As amended May 24, 1949, c. 139; § 34, 63 Stat. 94; Aug. 12, 1970, Pub.L. 91-375, § 6(j)(11), 84 Stat. 778.
 
 
 [2]
 § 2. Principals
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. As amended Oct. 31, 1951, c. 655, § 17b, 65 Stat. 717.
 
 
 [3]
 § 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting
 Whoever transports in interstate . . . commerce any . . . securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, . . . in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; . . .
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country. As amended May 24, 1949, c. 139, § 45, 63 Stat. 96; July 9, 1956, c. 519, 70 Stat. 507; Oct. 4, 1961, Pub.L. 87-371, § 2, 75 Stat. 802; Sept. 28, 1968, Pub.L. 90-535, 82 Stat. 885.
 
 
 [4]
 In recounting the facts, it is important to understand (1) the dates on which certain documents introduced in evidence were allegedly prepared, delivered, and recorded; and (2) the fact that while some of the documents relate to a group of five parcels of real property, other documents refer only to one parcel (i.e., Parcel Three, Lot 4, Block 1), or to no specific parcels. We therefore list chronologically the exhibits in the record:
 Item 1 (Gov. Exh. 7): certified copy of Deed
 of Trust dated 10/7/68, recorded
 10/23/68, executed by Wilbur W.
 Moheng and Martha Moheng, his
 wife, to Calaveras Title Co., Trustee,
 and Cecil Uglow and Helen E. Uglow,
 his wife, as joint tenants, covering
 five parcels of land to secure a
 $22,000 promissory note.
 Item 2 (Def. Exh. A): Power of Attorney
 dated 9/23/71 (never witnessed,
 ackowledged, or recorded), granted by
 Harley R. Walls and Margaret Walls
 to Kenneth Walls (the appellant). No
 description or reference to any
 specific real property made.
 Item 3 (Gov. Exh. 6): Certified copy of Grant
 Deed from the Mohengs to Harley
 Walls, dated 12/13/71; acknowledged
 12/13/71; recorded 1/7/72, 2:21 p.m.,
 covering the same five parcels
 listed in Item 1, supra.
 Item 4 (Gov. Exh. 9): Certified copy of
 Deed of Trust from Harley R. Walls
 and Margaret Petts Walls, his wife,
 to Calaveras Title Co., and the
 Mohengs, as beneficiaries, dated
 10/26/71; acknowledged 12/13/71;
 recorded 1/7/72, 2:25 p.m., covering
 the same five parcels listed in
 Items 1 and 3, supra.
 Item 5 (Gov. Exh. 8): Certified copy of
 Request for Notice of Default under
 Deed of Trust (Item 1, Gov. Exh. 7,
 supra), filed by the Mohengs, dated
 10/27/71; acknowledged 10/30/71;
 recorded 1/7/72, 2:21 p.m., covering
 the same five parcels listed in Items
 1, 3, and 4, supra.
 Item 6 (Gov. Exh. 1): Photostat of promissory
 note, dated 12/20/71, secured by
 assignment of "mineral rights" to
 property legally described as "Lot
 # 4, of Block # 1" (being "Parcel
 Three" of the five parcels described
 above).
 Item 7 (Gov. Exh. 3): Cancelled Alaska bank
 check, made by Violet E. Bjerke and
 endorsed by Kenneth Walls, dated
 12/20/71, in the amount of $10,000,
 paid 12/27/71.
 Item 8 (Gov. Exh. 4): Cancelled Arizona
 bank check, made by Violet E Bjerke
 and endorsed by Kenneth Walls,
 dated 12/20/71, in the amount of
 $10,000 paid 12/20/71.
 Item 9 (Gov. Exh. 2): Certified copy of original
 quitclaim deed, dated 12/20/71;
 acknowledged 12/20/71; executed by
 Kenneth W. Walls, the appellant, before
 Joseph C. Raineri, notary public;
 recorded 1/24/72 at the request
 of Mrs. Bjerke.
 Item 10 (Gov. Exh. 5): Certified photostatic
 copy of Item 9, supra.
 
 
 [5]
 Technically, appellant also raised a claim that he was denied his right to a speedy trial. Appellant's Brief at 4. However, this issue was not argued and we consider it to have been abandoned. Further, it has no merit
 
 
 [6]
 Very obviously, Mrs. Bjerke was a poor witness in her own behalf. She did not know if there were two papers signed by appellant Walls (promissory note and quitclaim deed) or whether $25,000 or $20,000 was to be paid to her on January 2, 1972. However, the exhibits on file speak to the fact that there were two documents, that Mrs. Bjerke did pay appellant $20,000 and that $25,000 was owed her by appellant, as his note states
 While the appellant's signatures on the deed and the note differ because of his use of a middle name in one, and not in the other, no question would be raised by an average person, after examining the two signatures, as to whether the same person had signed them.
 
 
 [7]
 Appellant argues that there was no proof that he had the requisite specific intent to defraud or lack of good faith. This is a question for the trier of fact. Intent to defraud can be found from circumstantial evidence and need not be specifically admitted or confessed. United States v. Jones, 425 F.2d 1048, 1058 (9th Cir.), cert. denied, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970). Where intent to defraud has been charged in the indictment, instructed upon and found by the jury, we cannot say that the evidence of intent was insufficient. Id. Furthermore, even if appellant did not actually know that his representation was false, he could have been found by the jury to have acted in reckless disregard of the truth or falsity of his statements, which is sufficient to charge a defendant with knowing falsity. United States v. McDonald, 576 F.2d 1350, at p. 1359 (9th Cir. 1978), slip op'n at p. 1431
 
 
 [8]
 In December, 1971, appellant borrowed $20,000 from Ensyne Clark, after telling Clark that he was buying property in Alaska from a lady named Campbell. Clark was never repaid. In February, 1977, the appellant told Clark he used the $20,000 to repay a lady in Mesa, Arizona. (RT 124-129). Appellant later told Mr. Clark that he would be paid in February, 1972. Mr. Clark has never been repaid. (RT 128-29)
 In the spring of 1975, appellant borrowed $9,500 from Claude Haynes on appellant's representation it was to be used to promote the sale of a ranch in California. Mr. Haynes has received back $1,400, and is owed the balance. Appellant represented to Mr. Haynes that the balance would be paid upon the closing of the purchase of the ranch. The sale negotiations for the ranch began in March, 1975. (RT 132-137).
 
 
 [9]
 The jury was instructed to consider similar transactions in determining whether appellant acted in good faith or with intent to defraud. (RT 305-306). However, the use of similar transactions was not specifically restricted to the uses set forth in Fed.R.Evid. 404(b)
 
 
 [10]
 THE COURT: I can't argue with you, Mr. Bruhn. All I can tell you is that you go in the jury room with the other eleven jurors and you vote your conviction. If you feel that he is not guilty of the charge, then you should hold out for not guilty. If you become convinced that he is guilty of the particular charge that is all he is on trial for, is what he is charged with then you will have to vote your conscience, vote it as you see the evidence, but I can't explain to you any further. I can't tell you what to do. I can't tell you what I think of the evidence. I can't tell you what I think of the case or anything else
 That is not my job nor my prerogative. (RT 316-317).
 
 
 [11]
 THE COURT: The only reason I would call a mistrial other than for some misconduct that may happen that would require a mistrial, would be if the jury can't agree, and if the jury can't agree, then we will declare a mistrial and, unless the government dismisses the case, we will try it again with a different jury. (RT 317)
 
 
 [12]
 All that the foreman could have testified to was the fact that Bruhn had participated in the in-chambers conference; he would not have been permitted to testify as to how that conference affected the jury's mental processes in arriving at a verdict. Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892). But the fact that the conference had occurred was obviously well known to both counsel who had been present. Thus, no lawful purpose would have been served by permitting interrogation of the foreman in the manner requested by defense counsel