**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas P. RICHARDSON,
Defendant-Appellant.**

**Nos. 76–2125, 77–3094 and 78–1402.**

United States Court of Appeals,
Ninth Circuit.

Sept. 6, 1978.

Rehearing and Rehearing En Banc
Denied Nov. 22, 1978.

Richard G. Sherman (argued), Los Angeles, Cal., for defendant-appellant.

David R. Hinden (argued), Los Angeles, Cal., for plaintiff-appellee.

Before BARNES, HUFSTEDLER and TANG, Circuit Judges.

BARNES, Senior Circuit Judge:

## I. INDICTMENT IN NO. 76–2125

Before us is the appeal of defendant Richardson of his conviction in No. 76–2125, (indictment for violation of Security Exchange Commission's charges) on six of the 46 counts of an indictment charging conspiracy, fraud in the sale of securities, filing a false financial statement with an agency of the United States Government, and wire fraud. Four other defendants were indicted with him, on one or more counts of the above mentioned crimes. All four co-defendants at one time or another prior to trial had entered pleas of guilty to one or more counts of this indictment. Appellant did not plead guilty, but pursuant to an agreement between the Government and Richardson, the Government proceeded to trial on six counts of the indictment. (The others were dismissed by stipulation.) Gov.Ex. 168(I) was the stipulation admitted into evidence which constituted the Government's case-in-chief.

Appearing in the margin is the description in the Government's Brief of appellant's conduct,[1] which was undisputed at

1. "The stipulation and accompanying exhibits recited the overwhelming testimonial and documentary evidence relating to Richardson's involvement in the stock fraud, including the testimony of his co-defendants. Briefly, the evidence presented was that, commencing in January of 1974 and continuing through April 15, 1975, at the direction of Thomas P. Richardson, the firm of T.P. Richardson & Co. began to deviate from its normal practice of matching buy and sell orders of large blocks of stock between institutional investors and began to speculate heavily for its own account in the stock market by taking short positions in several volatile stocks traded on the New York Stock Exchange. [Ex. 168(I) ¶ 25–29]. At the direction of Thomas P. Richardson, defendants Kevin Kelley and John Kelley placed orders to sell stocks at various brokerage firms across and (sic) country and intentionally deceived those firms by omitting to disclose that the stock sales were short; that T.P. Richardson & Co. did not own the stock. [Id. ¶ 25–29, 49–55].

"In order to make delivery on its short sales, Thomas P. Richardson borrowed stock from several major institutions including Harvard, Yale and Cornell Universities. [Id. ¶ 31–34]. Utilizing the proceeds from its stock sales, T.P. Richardson & Co. posted cash collateral with these stock lenders equal to the fair market value of the stock borrowed. [Id. ¶ 36–38]. T.P. Richardson & Co. was contractually committed to maintain on a daily basis the cash collateral value of the stocks with the stock lender. [Id. ¶ 37]. As the stock market went up, T.P. Richardson & Co. was compelled to come up with an increasing amount of cash to maintain the cash collateral with these stock lenders. [Id. ¶ 39].

"As of December 31, 1974, Richardson's brokerage firm was heavily committed to the stock market. [Id. ¶ 34]. To make delivery on its sales, it had borrowed in excess of $25,000,000 worth of stock from fourteen institutions, including 41,800 shares of DuPont (E.I.) de Nemours & Co. common stock, 142,-000 shares of Halliburton Co. common stock, and 23,700 shares of Schlumberger Co. [Id. ¶ 34]. Additionally, as of December 31, 1974, T.P. Richardson & Co., Inc. had sold an additional 25,700 shares of Halliburton Co. common stock, 18,500 shares of Schlumberger, Ltd. common stock and 24,700 shares of Texas Instrument common stock for which the firm had been unable to borrow stock. [Id. ¶ 29]. The assistant cashier at T.P. Richardson & Co. was instructed by Richardson to give false excuses for the delays in delivering the stock sold. [Id. ¶ 79].

"In order to conceal the massive short positions and stock borrowings on T.P. Richardson & Co.'s books and records, Thomas C. Thomas and another employee created, with the knowledge and understanding of Richardson, an elaborate *false bookkeeping scheme.* Stock lenders were falsely classified as regular customers of the firm from whom the firm had bought (not borrowed) stocks. To conceal the short sales for which no borrowing had been made, false entries were made on the account of a regular customer of the firm to reflect that the T.P. Richardson & Co. had purchased more stock from the customer than it had purchased. [Id. ¶ 84–89]. Based upon these false entries in the firm's books and records, false financial statements were prepared which concealed the stock borrowings and short positions and were submitted to the Securities and Exchange Commission and banks with whom T.P. Richardson & Co. had lines of credit. [Id. ¶ 43–44, 90].

"The evidence further demonstrated that the defendants engaged in several last ditch efforts to gain more time and money in the hopes that the market would turn downward. These efforts included a check-kite resulting in a $434,000 loss to Lloyds Bank in Los Angeles. [Id. ¶ 91–92].

"Ultimately, the defendants' scheme collapsed, resulting in losses of $3,400,000 to brokers through whom T.P. Richardson & Co. had sold stocks short, $2,982,000 to stock lenders. [Id. ¶ 39]."

(Government's Brief, pp. 15 to 18.)

the trial and is undisputed on this appeal.[2] This information was first voluntarily brought to the attention of the S.E.C. on 4/15/75 by co-defendant Thomas, and Richard R. Scott, Richardson's attorney. Prior to this date, appellant had been under investigation by two different agencies of the United States for violation of the Neutrality Act, (shipping guns to Robert Vesco in Costa Rica and/or Panama); and the Mann Act (transporting women across state or national boundaries for immoral purposes). Admitting the facts in the S.E.C. complaint, the appellant's sole defense was that he had been entrapped.

After the court heard several motions, appellant waived his right to trial by jury, waived findings of fact, and after argument, the court made the following findings:

"THE COURT: All right. I have considered the evidence presented during the trial, as well as the lengthy and detailed stipulation that the parties have entered into. I also have considered the evidence that was presented at the pretrial hearing and it has been incorporated into these proceedings.

"I find from the evidence and beyond a reasonable doubt that the defendant did commit the acts that are charged in Counts One, Three, Four, Five, Seven and Thirty-seven of the indictment, and in committing (sic) those acts he did also commit the offense, and that when he committed these offenses, he did so knowingly and willfully with the intent that is the requisite of these crimes.

"Mr. Richardson has relied heavily on the defense of entrapment, and while it has been established by the evidence that Mr. Ginsburgs was working as an informant for the Customs Bureau and also for the Beverly Hills Police Department during the period set forth in this indict-ment, the only evidence is that his efforts were directed solely toward the Neutrality Act violations.

"But even putting that aside and viewing the evidence in the light most favorable to the defendant, Ginsburgs really was nothing more than a confederate of the defendant in his illegal acts, at the very best. Ginsburgs really merely said to the defendant, 'Why don't you do these illegal acts?'

"And the defendant knew that the proposal was illegal, and, however, with little hesitation he agreed to carry out the scheme that only he could accomplish, and he, in effect, said that, 'I know it is illegal, but it sounds good, and I will do it.'

"Mr. Richardson, I find, was not entrapped or induced to commit these offenses. I find that he was ready and willing to commit the crimes charged whenever the opportunity was afforded, and that is exactly what he ultimately did."

(R.T. 1223–1225 in No. 76–2125.)

Thus, there is no question but that defendant was guilty as charged in No. 76–2125, unless as a matter of law the trial judge erred in finding there was no entrapment.

█ A careful examination of several thousands of pages of pleadings, testimony and exhibits convinces us there was no error in that finding by the trial court. Richardson was not entrapped, save by his own volition and desires.

## II. THE MOTION FOR A NEW TRIAL (OR FOR A DISMISSAL OF THE INDICTMENT). APPEAL IN NO. 76–3094

After conviction and sentence, appellant changed attorneys, and made the above motion, and asked for an evidentiary hearing before the trial judge. After much maneuvering and argument, a partial evidentiary

---

2. There was ample evidence of defendant's guilt. Appellant conceded (Appellant's Op.Br., p. 13) that

"... [t]he government's case in chief ... submitted by stipulation ... contained ample evidence of Richardson's guilt, and Richardson then presented the de-fense that he was entrapped into the commission of the crimes by a government informant named Jack Ginsburgs. . . . These facts are not summarized because they do not (in appellant's opinion) relate to the issues on this appeal."

hearing was granted to permit the court to review the four issues now urged by appellant.[3]

These four issues raised are expressed differently by the two parties. We prefer the Government's expression:

| DEFENDANT'S ISSUES | GOVERNMENT'S ISSUES |
|---|---|
| I. Conduct of Government requires dismissal of case. | I. Did Government's conduct deprive defendant of due process of law under the Fifth Amendment? |
| II. Appellant's motion to recuse Government counsel should have been granted. | II. Did denial of defendant's *after trial* motion to recuse Government counsel deprive defendant of due process (Fifth Amendment)? |
| III. Evidential hearing should have been granted on issue of ineffective counsel. | III. Did defendant receive effective assistance of counsel? |
| IV. Evidential hearing should have been granted on issue of insanity. | IV. Did the court err in failing to *initiate* competency hearing for defendant under 18 U.S.C. § 4244? |

---

From the first, the defense was primarily based on the alleged fact that one Jack Ginsburgs, a producer of "adult" books and a close friend and confidant of appellant, and one Robert D. Hall, a private investigator, also a close friend and associate of appellant, *were informants against him in the S.E.C. investigation.* Government counsel persistently denied this, saying Ginsburgs was an informant to Customs Agent Joseph Charles in the Neutrality Act investigation *only.* Hall was murdered and Ginsburgs convicted of the murder and sent to state prison. Hall could not, and Ginsburgs would not, testify on behalf of appellant in the New Trial motion. This factor increased defendant's claim that his good friends, Ginsburgs and Hall, were informants against him during, and with respect to, the S.E.C. investigation.

At the hearing on the motion for a new trial, the "informant charges" made by appellant in the New Trial proceedings were categorically denied by Assistant U.S. Attorneys Marella and Wilson, Customs Agent Charles, and S.E.C. Counsel Mercer. The testimony given by Robert Hall in his two appearances before the grand jury was sub-

mitted to Judge Byrne *in camera*, together with a supplemental affidavit of Marella. Marella swore he had never heard or even known prior to March 1st, 1977, (almost two years after co-defendant Thomas and Attorney Scott for appellant had gone to the S.E.C.), of the twelve tape recordings given by Hall to Assistant U.S. Attorney Wilson. Marella also swore he had but one meeting or conversation with Jack Ginsburgs, and received no information from him.

Finally, (and most convincing if anyone could believe him) was the extensive testimony of Jack Ginsburgs himself (R.T. No. 76–2125, pp. 509–592), then under examination (actually cross-examination) of Mr. Sharp, co-counsel for appellant, that he was admittedly an informant to Agent Joseph Charles with respect to the latter's investigation of appellant for violation of the Neutrality Act, *alone.* "I gave him information regarding the alleged gun running to Costa Rica. Yes." (Idem, 515.) "I had no contact with Charles after August, 1974 (p. 517), when I procured an attorney for him (appellant) in San Antonio (p. 519)." Ginsburgs did tell Agent Charles appellant Richardson had called his attorney Scott on the

---

3. "Partial" because the trial judge originally refused to hear evidence as to the last two of the four issues listed in the opinion, namely— the alleged ineffective assistance of counsel, and the appellant's questioned competency to stand trial.

telephone and asked him (Scott) to please clear his (appellant's) driveway of the agents that were there in Bel Air (p. 523) after the S.E.C. investigation started.

Ginsburgs was present at many conversations, some of which while Mr. Sharp was present, concerning appellant's financial difficulties.

"Q (by Mr. Sharp) Did you at that time report *any* of that particular conversation to *any* Government Agent? (Emphasis added.)

"A No, sir. (p. 526, 11. 20–22).

"Q Did you ever report to any Government Agent any conversation that you overheard between me and Mr. Richardson regarding the allegations that had been made against him in this particular case?

"A No, sir." (pp. 527–528).

Ginsburgs' flat denial as to his furnishing any information respecting the Securities case, included any conversations with Assistant U.S. Attorney Marella.

Ginsburgs was also asked about his furnishing any documents to Captain Jack Egger of the Beverly Hills Police Department (now retired) which Ginsburgs, according to appellant's attorneys, had allegedly *purloined* from appellant. Ginsburgs readily admitted he had furnished (1) copy of an appraisal concerning the value of appellant's house; (2) "a thing" on "Rich-Air-Son" (concerning the jet plane this subsidiary owned by Richardson used for plane travel to various places, including Costa Rica); (3) a list of employees of Richardson; and (4) "possibly" a copy of Richardson & Co., Inc.'s financial statement of November 30, 1973 (idem, p. 538), all of which Ginsburgs said he had received personally from either Richardson or Thomas (idem, pp. 538–539). "I gave him (Dr. August Tagliaferri) the documents so he could try to help Mr. Richardson through his financial prob-

lems (idem, p. 540), and gave a copy to Mr. Egger." He added: "There is nothing confidential about any of this information." (Idem, p. 541.)

Jack Ginsburgs was then interrogated about his wholesale "check-kiting" transactions, and Exhibits A, B and C were introduced by defendant. Exhibit A was a card naming Jack Ginsburgs as a "consultant." Exhibit B was a statement (a 17–A–5 Report) that Mr. Richardson's company *was required by the S.E.C. to send to all its customers*, and Exhibit C was the *appraisal of the value of defendant Richardson's home*. These were the allegedly purloined documents.

After counsel for Richardson had examined Jack Ginsburgs, the court asked Ginsburgs and Jack Egger, the Beverly Hills Police Captain, several questions. These were to put on the record through the introduction of Exhibits 3A, 3B and 3C, which were, said the court, "any parts of the documents read by the court *in camera* that seem possibly, potentially connected in any way with this case." [4]

We conclude from examination of the voluminous and sometimes confusing record:

I. That the trial court's ruling in the original case that there was no entrapment of the defendant was correct. There was no evidence worthy of the name that supported this theory of defense.

■ II. That the trial court's ruling that the appellant's application for an order recusing Mr. Wilson and Mr. Keller should be denied is correct—as to Mr. Keller because it was and is moot; as to Mr. Wilson because there was no factual or legal basis for such an order, by reason of the overwhelming evidence to the contrary, as found by the trial judge. No case law is submitted by appellant. *Compare: New-*

---

4. If Richardson's counsel believed that Ginsburgs' or Hall's testimony could have helped Richardson, he could have called either of his client's friends to testify prior to the finding of Richardson's guilt on March 26, 1976. Hall was murdered by Ginsburgs on July 22, 1976, and Ginsburgs and LaBell were not charged with the murder until September 1976. If Richardson's counsel believed that Ginsburgs' or Hall's testimony was injurious to his client, he had ample opportunity to effectively cross-examine him, as he did do. *Cf. United States v. Cervantes*, 542 F.2d 773, 776–777 (9th Cir. 1976).

*man v. Sigler*, 421 F.2d 1377, 1379 (8th Cir. 1970) *cert. denied*, 399 U.S. 935, 90 S.Ct. 2267, 26 L.Ed.2d 808 (1970).

III. After the trial court's careful and exhaustive evidentiary hearing on whether appellant's Fifth and Sixth Amendment rights were violated by alleged misconduct of government counsel in the trial and pretrial proceedings, the trial court found that the defendant Richardson's

" . . . constitutional rights have not been violated, that there has been no showing that the contents of (certain missing) tapes contained any material with reference to the Securities case, or that the material was in any way used by the government in this case.

" . . . I do not find that any of the rights of the defendant to a fair trial or right to counsel have been violated.

"There has been no evidence that there was any intrusion upon the attorney-client relationship of the defendant, nor that Mr. Hall, during the time that he was acting as an investigator for Mr. Richardson was at the same time acting as an informant for the government with reference to any matters relating to this case.

"The motion in both the Richardson and Kummer cases—this motion in each of those cases, is denied."

(Vol. VIII in No. 76–3094, pp. 924–925.) [5]

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense . . .. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

" . . . The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt."

*United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). *Cf. United States v. Bracy*, 566 F.2d 649, 654–656 and 658 (9th Cir. 1977); *United States v. Brown*, 562 F.2d 1144, 1149 (9th Cir. 1978). *Compare: United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974).

■ There was no substantial evidence presented that counsel's aid for appellant was ineffective at defendant's trial. This is true whether we adopt either of the two tests being considered by this circuit at this time—*Cooper v. Fitzharris*, 551 F.2d 1162 (9th Cir. 1977); *Brubaker v. Dickson*, 310 F.2d 30, 37 (9th Cir. 1972).

IV. There thus remains in this case only the issue of whether the trial court erred in failure to initiate competency hearings for defendant under 18 U.S.C. § 4244.[6]

---

5. The reference here is to *United States v. Kummer*, No. 78–1402 on appeal. The reference to the above case is confusing, but a portion of it relating to Thomas P. Richardson was, by stipulation between the appellant and the government, transferred from Judge Hauk to Judge Byrne, to be tried on the same issues and the same evidence in the No. 76–3094 appeal; the other defendants in the *Kummer* case to remain for trial or plea before Judge Hauk. This was done, and Kummer was found guilty. The same evidence which convicted Thomas P. Richardson in the two principal cases served to convict him in No. 78–1402, despite similar defenses of prosecutorial misconduct, the denial of appellant's motion to recuse government counsel, and the possible incompetency of Richardson. Judge Byrne convicted Thomas P. Richardson in No. 78–1402 on December 22, 1977, denied defendant Richardson's motion to dismiss, and sentenced him on January 31, 1978, to five years, which was suspended and

Richardson was placed on probation for five years, with six months confinement in a jail type institution, consecutive to his previous six year sentence.

6. On August 4, 1977, in the *Kummer* case, only within the remanded hearing (No. 76–3094) Vol. IX, p. 946, et seq., after Mr. Richardson had waived a jury trial and special findings of fact, his counsel suggested that because of his client's "illogical behavior and the use of drugs," a psychiatric examination and report should be had. The trial court asked Mr. Sherman if he "was talking only about insanity and not of competency."

"THE COURT: You feel that he is totally competent now?

MR. SHERMAN: Yes. He is not using anything now . . . there is no question as to Mr. Richardson's competency right at this time. He is thoroughly, completely competent, as he sat in court with me throughout

■ Neither the United States Attorney, nor his assistants, nor either of appellant's own counsel, nor the trial judge came to a conclusion they, or any one or more of them, felt they had *reasonable cause to believe* that the defendant herein was presently insane or so mentally incompetent as to be unable to understand the proceedings against him, or properly to assist in his own defense, during the entire period of his several trials. This fact tells a great deal about the validity of this claimed error. The trial and the hearings lasted from defendant's arraignment on November 10, 1975 to August 11, 1977; the third (Kummer) trial to December 22, 1977. During this time appellant was periodically under the observation of the court, his attorneys and the government attorneys. During the previous July and September of 1974, defendant had testified as a witness before a Committee of Congress, looking into his possible connections with Robert Vesco. The later tapes of defendant's conversations with Robert Vesco, Hall, Ginsburgs, and others, indicate appellant was an obviously worried man, who faced six years in prison, but gave no evidence of mental incapacity. In fact, quite the contrary appears to be true.[7]

We have carefully reviewed (1) the proceedings during appellant's trial leading to his conviction by the district court, and (2) the proceedings on remand leading up to the denial of appellant's "Motion for a New Trial, or in the alternative, for a Dismissal

of the Indictment," and (3) two similar issues raised in the consolidated charges against Thomas B. Richardson in the *Kummer* case. We conclude no error was committed, and each of the trial court's dispositions, in their entirety, is *Affirmed*.

The application for Nullification of the District Court's order revising Terms of Bail on Appeal is denied as moot.

these entire proceedings." (Vol. IX, No. 76–3094, pp. 933–934)

The trial judge also stated:

"I want it clearly understood for this record and clearly understood on appeal that any issue raised as far as insanity or any psychiatric evaluation should in no way be considered in the Richardson case. I do not want an issue of insanity raised in one case to be then on appeal stated, 'You see, this is what the psychiatrist says,' whatever he may say, 'in the Kummer case and should have also been true in the Richardson case.'

"It was not raised in that case. There was no reason to, in my opinion, believe that an insanity defense in any way existed in that case."

7. Even Mr. Sharp, co-counsel for appellant Richardson at his trial, was confident that there

was no reason to raise the competency of his client at his trial. When it was reported to the court that Mr. Richardson was acting "irrationally" when he used a sledge hammer to inflict $100,000 damage on a home he had just lost through foreclosure, the following colloquy occurred:

"THE COURT: Counsel, as long as it has been raised, is there any question in your mind about the competency of Mr. Richardson to participate in his own defense, and cooperate with you in this trial?

"MR. SHARP: No, your Honor. I am aware that he must be able to assist me in the preparation of this case, and I am convinced he is." (R.T. Vol. II, p. 72, Appeal No. 76–3094.)