**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Donald HUMPHREY,**
**Defendant-Appellant.**

No. 76–1392.

United States Court of Appeals, Ninth Circuit.

Jan. 31, 1977.

---

Robert G. Maslan (argued), Seattle, Wash., for defendant-appellant.

Robert H. Westinghouse, Asst. U.S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

* Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

1. Agent Peabody testified as follows regarding this interchange:

    A. But we did examine it, yes.

Before BROWNING and KENNEDY, Circuit Judges, and LUCAS,* District Judge.

ANTHONY M. KENNEDY, Circuit Judge:

Appellant Donald Humphrey was convicted of possession of heroin with the intent to distribute, a violation of 21 U.S.C. § 841(a)(1). On appeal, he claims that the district court erred in failing to exclude the heroin admitted in evidence against him, and that the evidence was insufficient to show an intent to distribute. We affirm.

Humphrey asked for a package at the Western Airlines air express counter located in the Seattle-Tacoma International Airport. At first, airline officials were unable to locate the package, but it was later reported to be at the lost and found desk at another part of the terminal. Humphrey was directed there. The Western Airlines employee who first dealt with Humphrey had become suspicious of him because of his behavior and his manner in explaining that the package contained a birthday present, probably a sweater. The employee therefore telephoned ahead to the lost and found desk and spoke with Peabody, another Western Airlines agent. Peabody commented that the package did not look big enough to contain a sweater; the first agent urged Peabody to inspect the package if possible.

After Peabody called the airport police, Officer LaBissoniere came in response to the call. Peabody explained the situation and said that he would request Humphrey to open the package because, in transit, a label marked "damaged when received" had been affixed to it. The officer agreed that this would be "a good idea" and retired to an inner office.[1]

    Q. The two of you, you and Officer LaBissoniere?
    A. Yes.
    Q. Okay. He is with the Port of Seattle Police out there?
    A. Yes.
    Q. Okay, and he expressed an interest in having the package opened?

When Humphrey arrived at the lost and found, Peabody requested identification, and Humphrey left to get it. When Humphrey returned, Peabody explained that the package should be inspected for damage. Humphrey opened the package and the only visible contents were two crumpled newspapers. Together Humphrey and Peabody unfolded the first newspaper and spread it on the counter. That paper was empty. Humphrey then removed the second newspaper from the package, began to unroll it, crumpled it again and said, "I guess it isn't there." He put the paper under his right arm and turned to walk towards the door. Peabody reached across the counter and took the paper from under Humphrey's arm. Humphrey continued walking out of the office.

Officer LaBissoniere, who had observed these incidents from the inner office by means of a convex mirror, then joined Peabody. Together they unrolled the second newspaper and discovered a rubberized container with 24.6 grams of 17% pure heroin.[2]

We have recently reiterated that "the fourth amendment protects against unreasonable intrusions by the government, but not against the conduct of private individuals." *United States v. Sherwin*, 539 F.2d 1, 5 (9th Cir. 1976) (en banc). We must therefore inquire here whether the person seizing the property and making the search was acting as an agent of the state. This case is more complex than *Sherwin*, where after a private search the contraband was discovered and removed from its container before any police involvement. Here the officer was consulted before the seizure, remained close at hand, and examined the contents of the package with the airline employee after the defendant had departed.

■ In ruling on defendant's motion to suppress, the trial court held that the defendant abandoned the package when he walked out of the office after Peabody had taken the paper from under his arm. Applying the "clearly erroneous" standard by which such findings of fact mixed with law must be judged on review, *see United States v. Hart*, 546 F.2d 798 (9th Cir. 1976) (en banc), we cannot say that the district court erred in ruling as it did. The court could properly determine that the defendant did not intend to return.[3]

■ Nevertheless, the acts taken to establish the abandonment could not be considered by the trial court if they were tainted by unlawful police action. *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976). The record makes clear, however, that the critical act of seizing the property from the defendant, as well as the investigation preceding that seizure, were accomplished solely by the private entity. The police officer's active participation was limited to helping the private agent examine the

A. Not so much an interest. I said, "I've got this damaged when received tape on it," and I said, "I think I better have him, whoever shows up, check it out so that I can be free and clear of my liability."
Q. Okay.
A. And he did agree.
Q. That that would be a good idea?
A. Yes.

**2.** Agent Peabody testified as follows:
Q. Did you have occasion after his departure to examine the piece of newspaper that he had had under his arm more closely?
A. Yes, sir, I did, but could I state that Officer LaBissoniere immediately came out of the office and I told him, "I think we better take a look at this," and he agreed.
Q. You had the piece of newspaper in your possession at that time?
A. I still had it on the counter, yes.

Q. All right. Did you then begin to examine the piece of newspaper?
A. I gave it to Officer LaBissoniere and between us we opened it up, laid it out and spread it out to see what the contents were.
Q. Prior to handing it to Officer LaBissoniere were you able to determine simply by the feel whether or not it contained any object?
A. Yes, sir. It seemed to be more solid, there seemed to be something in there that made the ball fairly solid.

**3.** For similar factual circumstances where courts have found that property was abandoned, *see United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975); *United States v. Maryland*, 479 F.2d 566 (5th Cir. 1973); *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973) (en banc).

crumpled newspaper *after* the defendant left the scene. At that point, as the trial court expressly found, the owner had abandoned any possessory claim to the property.

■ Peabody, the airline employee, testified that in order to protect against spurious claims for loss or breakage, it was company policy to require inspection of the contents of damaged packages. The trial court specifically found that Peabody was acting in the company interest.[4] It is clear that the damage inspection could not have been carried out completely had Peabody allowed the defendant to leave with part of the contents of the package under his arm. While a private motive need not be lawful or legitimate in order to render a seizure or a search nongovernmental, *see, e. g., United States v. Ogden,* 485 F.2d 536, 539 (9th Cir. 1973) (private search motivated by curiosity); *Eisentrager v. Hocker,* 450 F.2d 490, 491 (9th Cir. 1971) (private entry and search presumed trespassory), the existence of a legitimate motive, as in this case, makes it unlikely that an allegation of a private motive is merely a subterfuge. The district court's finding that Peabody was motivated by private interests in seizing the crumpled newspaper and initiating the subsequent search is therefore fully supported by the evidence.

· ■ In light of the above, we find that the trial court could properly conclude that the acts of the private entity precipitating the defendant's departure from the office were not tainted and that the property had been abandoned. The Government's cooperation in examining the contents of the package therefore did not infringe on any expectation of privacy of the owner. "[T]here was no seizure in the sense of the law when the office[r] examined the contents of [the package] after it had been abandoned." *Hester v. United States,* 265

U.S. 57, 58, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924).

■■ The defendant also contends that the evidence was insufficient to support the district court's finding of an intent to distribute. In our analysis of this contention, the evidence presented at trial must be viewed in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Gonzales-Benitez,* 537 F.2d 1051 (9th Cir. 1976). A Drug Enforcement Administration agent testified at trial that the heroin (17% pure) had a value of $1,200 in bulk form, but could be processed for distribution to increase its value to $4,000. In the agent's opinion, the strength of the common dosage unit ranged from 3% to 8%, the average being 5%. Approximately 83.64 grams of 5% heroin could be derived from the quantity seized, which in turn could be packaged into 330 one-quarter gram doses for street sale. The agent further testified that heroin in the amount and concentration seized would be possessed for purposes of distribution. There was also testimony that the defendant was unemployed at the time of his arrest. Although it is a close case, we conclude that this evidence was sufficient to permit an inference that the defendant possessed the heroin with intent to distribute.

AFFIRMED.

---

4. Even if the employee, in addition to his primary motive, may have desired to help the Government, the seizure, and the subsequent search, would not necessarily become governmental. *See, e. g., Wolf Low v. United States,* 391 F.2d 61 (9th Cir. 1968); *Gold v. United States,* 378 F.2d 588 (9th Cir. 1967).