UNITED STATES of America,
Plaintiff-Appellee,

v.

Lynette BURNETTE,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Theresa BURNETTE,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael Curtis BURNETTE,
Defendant-Appellant.

Nos. 81–1153 to 81–1155.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1982.

Decided Feb. 10, 1983.

Norris, Circuit Judge, concurred in part and dissented in part and filed opinion.

Frank W. Frey, Tucson, Ariz., for Lynette B.

Donn Alpert, Tucson, Ariz., for Theresa B.

Frank R. Zapata, Tucson, Ariz., for Michael B.

John G. Hawkins, Rhonda L. Repp, Asst. U.S. Attys., Tucson, Ariz., for U.S.

Before ELY and NORRIS, Circuit Judges, and BURNS,* District Judge.

ELY, Circuit Judge:

On October 24, 1980, the University Branch of Home Federal Savings & Loan Association [hereinafter "Savings & Loan"] in Tucson, Arizona, was robbed. Subsequently, Michael Burnette, Lynette Burnette, and Theresa Burnette were arrested. Michael was charged with armed bank robbery in violation of 18 U.S.C. § 2113(d).[1] Lynette was charged with aiding and abetting armed bank robbery in violation of 18 U.S.C. § 2. Theresa was charged as an accessory after the fact to armed bank robbery in violation of 18 U.S.C. § 3. After a jury trial,[2] all three were found guilty as charged. Each appeals from his or her conviction. For the reasons set forth below, we affirm the convictions of Michael and Theresa but reverse that of Lynette.

## I. FACTS

On the afternoon of October 24, 1980, the Savings & Loan[3] was robbed by a lone black gunman. The robber took $5,049, including numerous "bait bills" with previously recorded serial numbers. Removal of these "bait bills" also automatically triggered a surveillance camera in the Savings & Loan which photographed the gunman during the commission of the robbery.

The robber was described by various bank employees and customers as being a slim black male approximately six feet tall. The robber was further described as wearing a red ski mask, grey sweatshirt, blue jeans or dark trousers, and tennis shoes. Because of the ski mask, witnesses to the robbery were unable to describe the gunman's face. Photographs taken by the surveillance camera corroborated the witnesses' description of the robber.

As he left the bank, the robber removed his ski mask and fled on foot. A bank customer, Peter Frank, gave chase. As he pursued the robber, Frank threw stones and shouted for assistance. A passing motorist, Larry Hill, heard Frank's cries, saw the chase, and responded by driving his truck into the robber's path. This action forced the robber to pass in front of Hill's truck in order to continue his flight. At this time Hill had a very brief opportunity to see the robber. Hill then left his truck and joined the pursuit of the fleeing robber. As Hill closed the distance between them to approximately four feet, the robber turned, removed a chrome-plated revolver from the bag he was carrying, and fired a shot at

---

* The Honorable James M. Burns, Chief Judge, United States District Court for the District of Oregon, sitting by designation.

1. 18 U.S.C. § 2113(a) provides:
 Whoever, by force and violence, or by intimidation, takes, or attempts to take from, the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any ... savings and loan association; ... shall be fined not more than $5000 or imprisoned not more than twenty years, or both.
 18 U.S.C. § 2113(d) provides in pertinent part: "Whoever, in committing, or in attempting to commit, any offense defined in subsection (a) ..., assaults any person, or put in jeopardy the life of any person by use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

2. Because certain evidence was admissible only against Lynette, two juries were empaneled. One jury was charged with the task of rendering a verdict as to Michael and Theresa. The other jury was concerned solely with Lynette.

3. At trial, it was stipulated that Home Federal Savings and Loan is a federal savings and loan within the meaning of 18 U.S.C. § 2113(g). Accordingly, federal jurisdiction over the robbery was established.

Hill. Hill quickly dropped to the ground and the bullet missed. Prior to falling to the ground, however, Hill had an opportunity to view the robber's face for approximately four seconds.

Frank continued his pursuit and saw the robber enter a waiting automobile occupied by two other black persons. Frank, an automobile mechanic, described the vehicle as a late model, "white over blue" Buick. Frank ran after the fleeing car for a short distance, shouting to passing motorists and pedestrians and requesting that they note the license number of the vehicle. Evelyn Cline heard Frank's shouts and responded by following the white and blue Buick. Cline was able to see the license plate on the car and made a written notation of the number. The license plate was issued by the state of Nevada and bore the number "TFG 162." A description of the robber, the car, and the license number was broadcast over the police radio.

The Buick bearing the above described license plates was seen approximately one hour later at the Tucson Inn by Sgt. Paul Hallums of the Tucson Police Department. As he approached, Sgt. Hallums saw two black females near the car. One, later identified as Lynette Burnette, was near the driver's door and appeared to be brushing the door handle. The other female, later identified as Theresa Burnette, was near the rear of the car and appeared to be removing the license plate. Sgt. Hallums then went to a concealed location in order to observe further the actions of Lynette and Theresa. After a short time they appeared to notice his presence and walked toward Room 123 of the Tucson Inn. One of them briefly stepped inside Room 123 and then both walked back towards the Buick. Shortly thereafter, they were followed by a black male later identified as Michael Burnette. Michael started toward the car, looked around, and then ran into an alleyway. He was later found hiding in a nearby dumpster. Theresa remained near the car and was apprehended there. At the time of her arrest, Theresa had in her possession a key to Room 123 of the Tucson Inn and two screws that fit the rear license plate bracket of the Buick.[4] Lynette started to leave the motel complex. Upon seeing this, Sgt. Hallums broadcast a description of Lynette along with a request that she be stopped.

Officer James Williamson, also of the Tucson Police Department, had been monitoring the police radio broadcasts and had heard Sgt. Hallums' description of Lynette and his account of her activities. Officer Williamson saw Lynette and, pursuant to Sgt. Hallums' instructions, stopped her. Upon being stopped, Lynette spontaneously stated that "I just found this purse." Officer Williamson then asked Lynette for identification. From the side pocket of the purse she claimed to have just found, Lynette produced a traffic court summons bearing the name "Lynette Burnette." Officer Williamson then asked Lynette for identification bearing her photograph. Lynette stated that her identification was in her wallet and that her wallet was in "her purse." Officer Williamson asked Lynette how her wallet came to be in a purse that she had "just found." Lynette replied that she had "just slipped" the wallet into the purse. At this point, Officer Williamson, noting Lynette's furtive conduct, and fearing that she was about to run, ordered her to sit on the curb and placed her under arrest. Lynette complied and Officer Williamson renewed his request for photographic identification. Lynette started to open the purse, then quickly closed it. She then stood, turned away from the officer, and once again began to open the purse. Officer Williamson, fearing that Lynette was attempting to withdraw a weapon, moved around Lynette to see what she was

---

4. The key to Room 123 and the screws were actually found under the rear seat of the police car used to transport Theresa to the Tucson Police Station. The officer charged with the operation of that car had removed the rear seat that day prior to transporting Theresa and no objects were present. Immediately after transporting Theresa, the officer once again removed the seat and the key and screws were found. The officer's testimony at trial clearly established that only Theresa could have secreted the key and screws under the seat.

doing. He saw her withdraw something "small and black" from the purse and also noticed that the purse was "obviously stuffed" with money. Officer Williamson seized the purse and placed Lynette in handcuffs.[5] Officer Williamson then handed the purse to another Tucson police officer who had arrived on the scene, Officer Strickland. Officer Strickland completed the opening of the purse and found it to contain a large sum of money. Later, at the police station, the purse was more thoroughly searched and its contents inventoried. The purse was found to contain $5,048. Among the money found in the purse were the "bait bills" taken from the Savings & Loan.

Search warrants were obtained for the Buick used in the commission of the robbery and for Room 123 of the Tucson Inn. A search of Room 123 disclosed a chrome-plated .357 revolver containing four live rounds and one spent cartridge, money bands taken from the Savings & Loan, and two Nevada license plates bearing the number "TFG 162."[6] A pair of white surgical gloves similar to those used by the robber was found in the Buick.

Upon learning that a suspect had been apprehended, FBI Agent Lawrence Bagley contacted Larry Hill and asked Hill if he could identify the man who had fired at him. Hill stated that he could and agreed to accompany Bagley to the Tucson Inn to view the suspect. Upon arrival at the Inn, Hill saw a black man in handcuffs.[7] Hill was not asked to identify this man but later testified that he was immediately aware that the handcuffed man at the Inn was *not* the person who had shot at him. Hill then accompanied Bagley to the Tucson Police Station. When they arrived at the station, Hill saw a handcuffed black male seated in the rear of a police patrol car. Without prompting or questioning by Bagley, Hill immediately recognized this man as the person who had shot at him earlier in the day.

The case went to trial before two juries.[8] All three defendants were found guilty as charged. Each appeals. Michael contends that the District Court erred in denying his motion to suppress the identification testimony of Larry Hill. Lynette contends that: (1) The District Court erred in denying her motion to suppress the evidence seized from her purse; and (2) the District Court erred in failing to instruct the jury that she could not be convicted of aiding and abetting armed robbery unless she knew that Michael was armed.[9] Theresa contends that: (1) The District Court erred in permitting Sgt. Hallums to testify that Theresa was "removing" the rear license plate from the Buick; (2) the evidence was insufficient to establish that she was an accessory after the fact to armed bank robbery; and (3) the District Court improperly instructed the jury regarding the elements of being an accessory after the fact to armed bank robbery.

## II. DISCUSSION

### A. *Michael's Appeal*

■ Michael's sole contention on appeal is that the District Court erred in denying his motion to suppress the pretrial and in-

---

5. Officer Williamson testified at a pretrial hearing that Lynette was placed under arrest at the time he ordered her to sit on the curb.

6. Two Washington, D.C., license plates were also found in Room 123.

7. The handcuffed man Hill saw at the Tucson Inn was subsequently released.

8. *See* note 2 *supra.*

9. Lynette also argues that the evidence was insufficient to sustain her conviction for aiding and abetting armed bank robbery. Because armed bank robbery under § 2113(d) is not a separate offense, but only an aggravated form

of unarmed bank robbery under § 2113(a), *see United States v. Faleafine,* 492 F.2d 18, 23–25 (9th Cir.1974), the jury's finding that Lynette aided and abetted armed bank robbery necessarily included a finding that she was guilty of unarmed bank robbery. *Id.* Lynette does not contend that the evidence was insufficient to support a conviction of unarmed robbery. Because we reverse Lynette's conviction for aiding and abetting armed bank robbery because of the trial judge's failure to adequately instruct the jury, we need not consider the sufficiency of the evidence as to the "armed" element.

court identification testimony of Larry Hill. Michael argues that the pretrial "showup" at which he was identified by Hill was conducted in such an unnecessarily suggestive fashion that the admission of Hill's subsequent in-court identification testimony denied him due process of law.[10] We disagree.

We need not determine whether the pretrial "showup" at which Michael was exhibited to Hill was unnecessarily suggestive. For purposes of our analysis we assume that it was in fact suggestive to an unnecessary degree. It is firmly established, however, that due process does not require the suppression of all in-court identifications following unnecessarily suggestive pretrial identification procedures. *United States v. Field,* 625 F.2d 862 (9th Cir.1980). Rather, we must determine whether, in light of the totality of surrounding circumstances, the pretrial "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). "It is the likelihood of misidentification which violates a defendant's right to due process ...." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). Thus, even unnecessarily suggestive pretrial procedures do "not violate

due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977).

In *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382, the Supreme Court set forth certain factors to be considered by determining whether identification testimony possesses sufficient indicia of reliability to justify its admission at trial:

> The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.[11]

Against these five factors must be weighed the "corrupting effect" of the suggestive pretrial identification procedure. *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253. In evaluating this corrupting effect, we give consideration to "the conduct on the part of the government agents tending to focus the witness' attention on the defendant." *United States v. Crawford,* 576 F.2d 794, 797 (9th Cir.), *cert. denied,* 439 U.S. 851, 99 S.Ct. 157, 58 L.Ed.2d 155 (1978) (footnote omitted).[12]

Applying the above analysis to the present case, we conclude that the identifi-

---

10. Michael also apparently challenges the manner in which the Government solicited the in-court identification. When questioning Hill, the prosecutor asked if Hill could identify the "black male" he had pursued. Michael was the only black man in the courtroom. We do not believe the question was improper. There was never any dispute that the man pursued by Hill was black. Accordingly, the question was in no way prejudicial to Michael.

11. We formerly employed a somewhat different standard. That standard, originally enunciated in *Parker v. Swenson,* 332 F.Supp. 1225, 1230–31 (E.D.Mo.1971), and adopted by this court in *United States v. Crawford,* 576 F.2d 794, 797 (9th Cir.), *cert. denied,* 439 U.S. 851, 99 S.Ct. 157, 58 L.Ed.2d 155 (1978), provided for consideration of:

> the witness's opportunity to observe the perpetrator during the commission of the crime, the similarity between the witness's prior description of the criminal and the characteristics of the defendant identified at

trial, the presence and influence of other witnesses at the time of the prior identification, and the conduct on the part of the government agents tending to focus the witness's attention on the defendant.

Application of the *"Crawford"* test in the present case would not yield a result different from that reached through application of the *"Biggers"* test. It should be noted that the final two factors in the *Crawford* test are useful in evaluating the corrupting effect of the suggestiveness of the identification procedure. *See United States v. Field,* 625 F.2d at 866–68.

12. *United States v. Crawford,* 576 F.2d at 797, also mandates consideration of "the presence and influence of other witnesses at the time of the prior identification" in evaluating the corrupting effect of the identification procedures. This factor is not relevant here because no other witnesses were present at the time of the "showup."

cation testimony of Larry Hill was sufficiently reliable to warrant its admission at trial. Although Hill only viewed the robber for approximately twelve seconds, his view was unobstructed and at close range. When the robber turned and shot at Hill, Hill had an opportunity to view the robber's unmasked face for a period of approximately four seconds and from a distance of only four feet. It could reasonably be inferred that at the life threatening moment when the robber turned and fired, Hill's attention was focused sharply on his assailant. Hill described the robber as being a black male, approximately six feet tall and weighing approximately 160 pounds. Hill further described the robber as being clean shaven and wearing blue jeans or dark trousers. Hill's description was an accurate statement of the physical characteristics of Michael Burnette.[13] Moreover, Hill's description of the gun carried by the robber matched the revolver found in Room 123 of the Tucson Inn.[14] At the time of the "showup" at the Tucson Police Station, Hill exhibited a high degree of certainty that Michael was the man who had shot at him. Later, at trial, Hill testified that at the time of the "showup" he was immediately certain that Michael was the man.[15] Finally, the "showup" at the police station occurred no more than two hours after Hill had pursued the fleeing robber.

Nor does the suggestiveness of the "showup" itself appear to have influenced Hill in his identification of Michael. It should be noted that shortly before his confrontation with Michael at the Tucson Police Station, Hill had seen another handcuffed black male at the Tucson Inn. Hill

testified at trial that upon seeing the man at the Inn he had been immediately aware that the man was not the person he had earlier pursued at the Savings & Loan. Further, Hill testified at trial that he had recognized Michael as the man he had pursued prior to any police conduct directing his attention to Michael. Under these circumstances, we conclude that Hill's identification testimony was sufficiently reliable to permit its admission at trial. Accordingly, the conviction of Michael Burnette is affirmed.

### B. *Lynette's Appeal*

Lynette raises several arguments on appeal. First, she contends that at the time she was stopped by Officer Williamson he lacked founded suspicion to detain her and, accordingly, the evidence subsequently seized from her purse was inadmissible as the fruit of an unlawful detention. Second, Lynette contends that she had a reasonable expectation of privacy in the purse she was carrying at the time of her arrest and that, accordingly, the District Court's denial of her motion to suppress based on a contrary conclusion was error. Third, Lynette contends that the District Court erred in refusing to instruct the jury that she could not be convicted of aiding and abetting armed bank robbery unless she was aware that Michael was armed. We address these contentions in sequence.

■ Lynette's contention that her initial detention by Officer Williamson was unlawful is clearly without merit. It is well settled that, under certain limited circumstances, law enforcement officers may

**13.** Michael points to one allegedly erroneous statement made by Hill. Hill had previously stated that the robber wore a T-shirt with sleeves. Other witnesses, and the Savings & Loan surveillance camera, establish that, in fact, the robber wore a sweatshirt. We note that other witnesses also established that the robber wore a T-shirt under the sweatshirt and it is therefore possible that Hill did not err in stating that the robber wore a "T-shirt." In any event, we believe that the other indicia of reliability were sufficient to preclude any inference of unreliability based upon this single, minor discrepancy.

**14.** While an accurate description of the gun *may* not be strictly relevant to evaluation of the reliability of Hill's identification of Michael, it does tend to indicate that Hill was an accurate observer whose attention was sharply focused at the time of the confrontation.

**15.** Hill testified that he recognized Michael even before the police car in which he was riding had come to a complete stop.

briefly detain a suspect for investigative purposes. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such a detention is permissible when based on an officer's "founded" or "reasonable" suspicion that "criminal activity may be afoot." *Id.* at 30, 88 S.Ct. at 1884. Founded suspicion [16] exists when an officer is aware of specific articulable facts, together with the rational inferences drawn therefrom, that reasonably warrant suspicion that the person to be detained may have committed or is about to commit a crime. *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975); *United States v. Huberts,* 637 F.2d 630, 634–35 (9th Cir.1980); *United States v. Collom,* 614 F.2d 624, 628 (9th Cir.1979).

In the present case, the Tucson police officers [17] clearly had founded suspicion to detain Lynette. The police were aware that approximately one hour earlier the Savings & Loan had been robbed by an armed black male. They were aware that the robber had fled in a white over blue Buick containing at least one other black person and bearing Nevada license plate number "TFG 162." The "getaway" car was found at the Tucson Inn. Two black females, Lynette and Theresa, were near the car. Lynette was wiping or brushing the driver's door and Theresa was apparently removing the rear license plate. The police officers could reasonably infer that Lynette was somehow connected with the car and was, with the aid of Theresa, attempting to destroy evidence connecting her with the car. Upon seeing Sgt. Hallums, the two women went to Room 123 of the Inn. Shortly thereafter a black male, matching the description of the robber, emerged from Room 123 and *ran* into an alleyway. Theresa and Lynette then separated with Theresa returning to the car and Lynette attempting to leave the motel complex. Given the knowledge and observations of the police officers, we believe that

founded suspicion existed to briefly detain and question Lynette regarding her possible involvement in the robbery of the Savings & Loan.

Lynette next contends that the District Court erred in ruling that she lacked a reasonable expectation of privacy in the purse she was carrying at the time of her arrest and therefore could not challenge the legality of its search and seizure. The court based its decision on its finding that Lynette had abandoned the purse.

It is firmly established that warrantless searches of abandoned property do not violate the Fourth Amendment. *Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960); *United States v. Kendall,* 655 F.2d 199, 200 (9th Cir.), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1981); *United States v. Diggs,* 649 F.2d 731, 735 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981). One who has voluntarily abandoned property has no right to complain of its search or seizure. *United States v. Kendall,* 655 F.2d at 200. The intention "to retain a reasonable expectation of privacy is determinative of abandonment." *Id. See United States v. Jackson,* 544 F.2d 407, 409 (9th Cir.1976). Thus, if the person alleged to have abandoned property intends to retain his or her privacy interest in the allegedly abandoned property, there has been no abandonment. Whether a person intends to retain a privacy interest in the property is determined by objective standards. *United States v. Kendall,* 655 F.2d at 201. In making this determination, we look to the party's "words, acts, and other objective facts." *United States v. Jackson,* 544 F.2d at 409 (citation omitted). The District Court, relying principally on Lynette's statement that she had "just found" the purse, concluded that Lynette had evidenced an intention to abandon the purse. We must uphold this finding unless we find

---

**16.** Founded suspicion is identical to "reasonable" suspicion.

**17.** It is firmly established that one officer may rely on information provided by another officer

to establish founded suspicion or probable cause. *United States v. Bernard,* 623 F.2d 551, 560 (9th Cir.1979).

it "clearly erroneous." [18] *United States v. Diggs,* 649 F.2d at 735; *United States v. Humphrey,* 549 F.2d 650, 652 (9th Cir.1977). Our review of the record leads us to conclude that the District Court clearly erred in finding that Lynette had abandoned her privacy interest in the purse.

Although Lynette initially disclaimed ownership of the purse, her subsequent conduct during the confrontation with Officer Williamson strongly indicated her intent to retain a "reasonable expectation of privacy in the purse." At one point during the confrontation, Lynette referred to the purse as "my purse." Much more compelling, however, was Lynette's behavior while trying to comply with Officer Williamson's request for photographic identification. While trying to retrieve her wallet, Lynette took all possible precautions to retain her privacy in the contents of the purse. She stood and placed her body between Officer Williamson and the purse. She did not completely open the purse but instead merely opened it partially and reached in to extract her wallet. Moreover, at no time did Lynette indicate a desire to relinquish physical possession of the purse. Rather, she continued to hold the purse until it was physically removed from her possession by Officer Williamson.[19] Under these circumstances, we conclude that Lynette intended to retain a "reasonable expectation of privacy" in the purse and the District Court's finding of abandonment was clearly erroneous.[20]

Although we hold that the District Court erred in ruling that Lynette abandoned the purse, we conclude that the evidence seized from the purse was nevertheless properly admitted at trial. We may affirm the District Court on any basis fairly presented by record that, as a matter of law, sustains the judgment. *Dessar v. Bank of America National Trust & Savings Ass'n,* 353 F.2d 468, 470 (9th Cir.1965). Our review of the record in the present case leads us to conclude that Lynette's purse was properly seized and searched incident to a lawful arrest.

At the time he initially stopped Lynette, Officer Williamson had founded suspicion that she was somehow involved in the robbery of the Savings & Loan. During the course of their discussion, this founded suspicion ripened into probable cause to arrest. When hailed by Officer Williamson, Lynette immediately replied in a highly inappropriate manner that she had "just found" the purse she was carrying. She appeared reluctant to furnish the photographic identification requested by Officer Williamson. Her furtive conduct convinced Officer Williamson that she was about to flee. At this point, Officer Williamson placed Lynette under arrest and renewed his request for identification. When Lynette attempted to obstruct his view as she withdrew a small black object from the purse, Officer Williamson quite properly seized the purse. The purse was then handed to Officer Strickland whose brief search of the purse disclosed a large amount of cash. A subsequent search of the purse at the police station revealed additional evidence.[21]

---

**18.** In *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the Supreme Court defined the clearly erroneous standard as follows:

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

**19.** The majority of previous cases in which the courts have upheld a finding of abandonment have involved both a denial of ownership or interest in the property *and* a physical relinquishment of the property. *See United States v. Kendall,* 655 F.2d 199 (9th Cir.), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652

(1981); *United States v. Canady,* 615 F.2d 694 (5th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *United States v. Jackson,* 544 F.2d 407 (9th Cir.1976).

**20.** *See* note 18 *supra.*

**21.** Two Safeway Money Orders were found in Lynette's purse. A teller at the Savings & Loan testified that Lynette had entered the Savings & Loan prior to the robbery and attempted to cash a Safeway Money Order. The Money Orders were admitted into evidence in an attempt to circumstantially prove that Lynette had reconnoitered the Savings & Loan for Michael in preparation for the robbery.

It is settled Fourth Amendment doctrine that a police officer may, incident to a lawful arrest, conduct a contemporaneous warrantless search of the arrestee's person and of the area into which the arrestee might reach to retrieve a weapon or destroy evidence. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Containers found within that area may also be searched contemporaneously with the arrest. *Id.* Where such a container is not searched immediately, however, but is instead taken to the police station and searched later, a warrant is required. *United States v. Monclavo-Cruz,* 662 F.2d 1285 (9th Cir.1981). In the present case, Lynette's purse was searched immediately upon her arrest in a somewhat cursory fashion and later subjected to a more thorough search at the police station. During the search at the police station, additional evidence apparently not discovered in the initial search was found.[22] We must determine a question of apparent first impression: whether the warrantless search at the police station was valid given the initial lawful search incident to Lynette's arrest.

We believe that the warrantless search at the police station was valid and that the evidence obtained from that search was properly admitted at trial. The Fourth Amendment protects only "reasonable expectations of privacy." *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Supreme Court upheld a warrantless search of an arrestee's clothing conducted at the police station approximately ten hours after the arrest. The Court grounded its holding on the necessarily reduced expectation of privacy one holds in his person after being placed under arrest. *See United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Monclavo-Cruz,* 662 F.2d at 1290. In the present case, Lynette had been arrested and her purse lawfully searched incident to that arrest. The contents of the purse had been fully exposed to the police and, consequently, her expectation of privacy in the purse was necessarily reduced by a significant degree. Because Lynette's expectation of privacy in the purse had been significantly reduced by the initial search, we believe the subsequent warrantless search at the police station was valid. Accordingly, we hold that once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant.[23]

We believe our decision here is fully consistent with our prior decisions and with the policies underlying the Fourth Amendment's warrant requirement.[24] Requiring police to procure a warrant for subsequent searches of an item already lawfully searched would in no way provide additional protection for an individual's legitimate privacy interests.[25] The contents of an item previously searched are simply no longer private.

---

**22.** During the search of the purse at the police station, the serial numbers of the bills found in Lynette's purse were compared with the serial numbers of the "bait bills" and were found to match those numbers. Also, the Safeway Money Orders were apparently discovered at this time.

**23.** Our holding here is of course limited to situations where the initial search was lawful. We need not address any questions that might be presented where the item searched has been returned to the owner prior to the second search.

**24.** We also note the administrative difficulties adoption of a contrary rule would entail. Evi-

dence would have to be introduced to establish whether items seized were discovered during the initial search or during the subsequent station house search.

**25.** It is likely that, were we to require warrants for subsequent searches, police officers would routinely remove all items from containers seized at the time of the initial search and thereby insure that all items were discovered at that time. Thus, requiring a warrant for subsequent searches would be unlikely to provide any additional protection for individual privacy.

We also believe our holding here is fully consistent with our decision in *United States v. Monclavo-Cruz,* 662 F.2d 1285 (9th Cir.1981). In *Monclavo-Cruz* the defendant was carrying a purse at the time of her arrest. Although the purse could have been lawfully searched at the time of arrest, *see New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, it was not. Subsequently, at the police station, the police conducted a warrantless search of the purse. In holding the search to be a violation of the Fourth Amendment, we relied principally upon the strong expectation of privacy one holds in the contents of luggage, purses, and similar containers. Because the search was not conducted at the time of arrest, the defendant's expectation of privacy in the purse survived the exigencies justifying a warrantless search. Accordingly, the subsequent warrantless search conducted at the station house intruded upon the defendant's reasonable expectation of privacy and therefore violated the Fourth Amendment. *United States v. Monclavo-Cruz,* 662 F.2d at 1290. The present case is markedly different. Lynette's purse was lawfully searched at the time of her arrest and her expectation of privacy in the purse was thereby significantly reduced, if not destroyed. The subsequent search at the station simply did not violate any "reasonable expectation of privacy." *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387.

■ Finally, Lynette contends that the District Court erred in refusing to instruct the jury that she could not be convicted of aiding and abetting armed robbery absent proof beyond reasonable doubt that she knew Michael was armed. This contention has merit and, accordingly, we reverse Lynette's conviction and remand for further proceedings.

■ Knowledge that the principal has and intends to use a gun is an essential element of the offense of aiding and abetting armed bank robbery. *United States v. Jones,* 592 F.2d 1038, 1042 (9th Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Failure to give a requested jury instruction to that effect constitutes reversible error. *United States v. Short,* 493 F.2d 1170 (9th Cir.), *on rehearing,* 500 F.2d 676, *cert. denied,* 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974).

■ At trial, Lynette requested an instruction that she could not be found guilty of aiding and abetting armed bank robbery absent proof beyond a reasonable doubt that she knew Michael was armed. The District Court refused to give the requested instruction and Lynette made a timely objection. Accordingly, under *United States v. Short, supra,* Lynette's conviction must be reversed as to the armed portion of the offense and the case remanded. The Government may elect to retry Lynette for aiding and abetting armed bank robbery.[26] Alternatively, the Government may decide not to retry. In that event, the District Court may, on remand, resentence Lynette under the charge of aiding and abetting *unarmed* bank robbery.[27] *United States v. Short, supra.*

### C. *Theresa's Appeal*

Theresa raises three issues on appeal. First, she contends that the District Court erred in permitting Sgt. Hallums to testify as to his opinion that Theresa was "removing" the rear license plate from the Buick. Second, she contends that the evidence was insufficient to support her conviction as an accessory after the fact to armed bank robbery. Finally, Theresa contends that the trial court improperly instructed the jury as to the elements of the offense of being an accessory after the fact to armed bank robbery. Because we find these contentions to be without merit, we affirm Theresa's conviction.

---

**26.** Because we have not evaluated the sufficiency of the evidence to establish Lynette's guilt of that charge, we express no opinion whether retrial would be barred by double jeopardy. *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

**27.** The evidence was clearly sufficient to convict Lynette of aiding and abetting unarmed bank robbery. *See* note 9 *supra.*

Prior to trial, Theresa moved the court to preclude Sgt. Hallums from testifying that, in his opinion, Theresa was removing the rear license plate from the blue and white Buick. The motion was denied and, at trial, Sgt. Hallums was permitted to testify that Theresa was removing the license plate.

■■■ The admissibility of opinion testimony, pursuant to Rules 701 and 702 of the Federal Rules of Evidence, is committed to the sound discretion of the trial judge and his decision will be overturned only if it constitutes a "clear abuse of discretion." *United States v. Cox,* 633 F.2d 871 (9th Cir.1980), *cert. denied,* 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981); *Unitec Corp. v. Beatty Safway Scaffold Co. of Oregon,* 358 F.2d 470 (9th Cir.1966). Opinion testimony of a lay witness is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed.R.Evid. 701. We believe that Sgt. Hallums' opinion testimony was rationally based on his perceptions and was helpful to a determination of a fact in issue. At the time of Sgt. Hallums' arrival at the Tucson Inn, the rear license plate was still affixed to the Buick. Theresa was at the rear of the Buick and was holding an instrument that appeared to be a screwdriver. Shortly thereafter the rear license plate was missing. No one else had approached the vehicle. While it would have perhaps been better had the District Court limited Sgt. Hallums to statement of the underlying facts, we find no abuse of discretion in the admission of Sgt. Hallums' opinion testimony. Even were we to find the admission of Sgt. Hallums' opinion to be error, however, it would not justify reversal. Theresa's fingerprints were found on the Nevada license plate found in Room 123. At the time of her arrest, Theresa had on her person two screws fitting the rear license plate bracket of the blue and white

Buick. Accordingly, the admission of Sgt. Hallums' opinion testimony was, at most, harmless error. *See United States v. Cox,* 633 F.2d at 876.

Theresa next contends that the evidence was insufficient to support her conviction.[28] In particular, she argues that insufficient evidence was presented to establish beyond a reasonable doubt that she knew Michael used a gun in the commission of the robbery.

■■■ At the outset, we note that actual knowledge, as an element of the offense of being an accessory after the fact, may be shown entirely through circumstantial evidence. *United States v. Mills,* 597 F.2d 693, 696 (9th Cir.1979). Michael escaped from the scene of the robbery in a blue and white Buick accompanied by at least one and possibly two other black persons. Theresa was later seen removing the license plate from the Buick. The jury could have rationally inferred that Theresa was one of the persons in the Buick at the time of the escape and that she saw and heard Michael shoot at Larry Hill. Further, the jury could have inferred that Theresa saw Michael enter the car with a drawn gun. Moreover, Theresa had the key to Room 123 in her possession at the time of her arrest. The chrome-plated revolver used in the commission of the robbery was later found in Room 123. The jury could have rationally concluded that Theresa saw the gun in the room and knew that Michael had used it in the commission of the robbery. Accordingly, we conclude that the evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that Theresa knew Michael used a gun in robbing the Savings & Loan.

Finally, Theresa contends that the jury instructions were inadequate to inform the jury that it must find beyond a reasonable doubt that Theresa knew Michael was armed in order to find her guilty as an accesso-

---

**28.** Theresa also argues that the trial court erred in denying her motion for acquittal. Because the evidence was sufficient to permit a rational jury to find Theresa guilty beyond a reasonable doubt, we conclude that the trial judge did not err in denying the motion.

ry after the fact to armed bank robbery.[29] We disagree.

 The adequacy of jury instructions is determined by an examination of the instructions as a whole. *United States v. Mills,* 597 F.2d at 700. In instructing the jury, the District Judge stated at the outset that the jury was "not to single out any one instruction alone . . . but [was to] . . . consider the instructions as a whole and each in the light of all the others." The trial judge then stated the elements of the offense of armed bank robbery under 18 U.S.C. § 2113(d). In stating these elements, he stated that use of a gun in the commission of the bank robbery was an essential element of the offense under § 2113(d). He then instructed the jury that, in order to find Theresa guilty as an accessory after the fact, it must find beyond a reasonable doubt "that she knew that Michael Curtis Burnette . . . [committed] the bank robbery . . . in violation of Title 18, United States Code Section 2113(d)." The trial judge defined the requisite knowledge as "actual knowledge" that Michael had violated 18 U.S.C. § 2113(d). Theresa contends that the trial judge should have completely restated the elements of a violation of § 2113(d) when instructing the jury as to the elements of being an accessory after the fact to armed bank robbery. According to Theresa, the trial judge erred by referring to the code section without restating the elements of a violation of that section. We disagree. The trial judge had previously stated in full the elements of a violation of § 2113(d). He had told the jury to consider each instruction in light of all others. Although it might have been preferable for the court to reiterate the elements of § 2113(d), we believe the jury was clearly instructed that Theresa must have had actual knowledge of each element of § 2113(d), including knowledge of the use of a gun, in order to be guilty as an accessory after the fact to armed bank robbery.[30] We therefore conclude that the jury instructions, taken as a whole, sufficiently informed the jury that Theresa's knowledge that Michael was armed was an essential element of the offense of being an accessory after the fact to armed bank robbery.

### III. CONCLUSION

The convictions of Michael and Theresa Burnette are affirmed. The conviction of Lynette Burnette for aiding and abetting an armed bank robbery is reversed and the case remanded for further proceedings not inconsistent with this Opinion.

AFFIRMED IN PART, REVERSED IN PART.

NORRIS, Circuit Judge, concurring in part and dissenting in part:

I concur fully with the majority's affirmance of the convictions of Michael and Theresa. I also agree that Lynette's conviction for armed robbery must be reversed on grounds of faulty jury instructions. I disagree, however, with the majority's conclusion that the evidence of the contents of Lynette's purse discovered during the search at the police station was admissible at her trial.

**29.** In argument before this court, the Government contended that, because Theresa failed to request a specific instruction regarding knowledge, and because she failed to object to the instruction given, we must affirm her conviction unless we find "plain error." Theresa argued that, under our decision in *United States v. Brown,* 562 F.2d 1144 (9th Cir.1977), Lynette's request for a specific instruction and objection to the instructions as given should be imputed to Theresa.

In *Brown,* we held that "when one codefendant objects and thereby brings the matter to the attention of the court, further objections by other defendants are unnecessary." *Id.* at 1147, n. 1. Here, however, although a single judge presided at trial, Lynette and Theresa were tried by different juries and for different offenses. Because we conclude that the instructions given were fully adequate, we need not decide whether the rule in *Brown* extends to the situation presented in the case at bar.

**30.** We also note that the district judge gave an instruction on the lesser included offense of accessory after the fact to unarmed bank robbery despite the fact that the evidence conclusively established that the robber was armed. We believe this instruction served to emphasize further that Theresa could not be found guilty as an accessory after the fact to armed bank robbery unless she knew Michael was armed.

The district court admitted the evidence seized from Lynette's purse on the basis of its finding that Lynette had abandoned her privacy interest in her purse by stating to the arresting officer that she had "just found" it. The relevant question presented by Lynette's appeal, therefore, was whether the district court had erred in finding that this conduct constituted abandonment. I agree with the majority that there was no abandonment of the purse, and that the evidence seized from it cannot be admitted on this basis.

The majority goes on, however, to find the evidence admissible on a totally different ground. As I understand the majority's theory, it is that the police not only seized Lynette's purse at the time of her arrest, but conducted such an extensive search of it that her expectations of privacy as to its contents were destroyed. Because she no longer had any privacy interest in the purse, the theory continues, the Fourth Amendment presented no bar to further warrantless searches of it, and the evidence discovered in it at the police station was therefore admissible at her trial.

I dissent on this point for two reasons. First, the majority's decision is based on a theory that was not argued or litigated by the parties before the trial court and not raised by either Lynette or the government on appeal. Responding only to the district court's finding of abandonment, the parties here did not address the question whether Lynette could have lost her expectation of privacy in any other way. Attempts to elicit supplemental briefs in accord with Ninth Circuit General Order 4.2[1] produced only confused responses, as the parties failed to grasp the question they were unexpectedly asked to address. The majority's opinion, therefore, decides *sua sponte* a question that has not been litigated: whether Lynette's purse was searched at the time of her arrest, and, if so, whether the search was extensive enough to destroy her expectations of privacy in the purse before it was searched at the police station.

The majority seems to feel that it is deciding a novel issue of constitutional law. To make this assumption, however, misperceives the nature of the question before us. Certainly, I could not quarrel with the majority if what it intends to hold is that an extensive search of Lynette's purse at the time of her arrest can be followed by subsequent warrantless searches designed solely to uncover items possibly overlooked or to further inventory evidence already discovered. It is no more than common sense to suppose that once the police have thoroughly searched a purse, they can search it again later without a warrant to discover any evidence they may earlier have missed. What the majority misunderstands, however, is that the issue is not a constitutional, but a factual one. The question is not whether a thorough search of Lynette's purse would have destroyed her privacy interests, but whether a thorough search was in fact undertaken. Judge Ely seems to assume that at least a "brief" or "cursory" search was done at the time of Lynette's arrest, *see supra* pp. 1048–1049. No record support for that conclusion is offered. In fact, a review of the reporter's transcript of the suppression hearing and the trial not only makes clear that the parties did not litigate the issue whether the police searched Lynette's purse at the time of her arrest, but provides no evidentiary basis for the majority's conclusion that such a search was conducted.

Because the record is factually incomplete, it is inappropriate even to reach the question of the impact of the initial investigation on Lynette's expectations of privacy. Based on the record in its present state, however, it can be said only that the officers seized Lynette's purse. There is simply no evidence to indicate that they conducted any search of it at all until they examined it at the police station some hours later. Because there was no abandonment, and

1. Ninth Circuit General Order 4.2 provides that:
If a panel determines to decide a case upon the basis of a significant point not raised by the parties in their briefs, it should give serious

consideration to requesting additional briefing and oral argument before issuing a disposition predicated upon the particular point.

because the officers merely seized, but did not search, Lynette's purse, the case is governed by *United States v. Monclavo Cruz,* 662 F.2d 1285 (9th Cir.1981), which holds that neither the arrest of a suspect nor the seizure of his belongings operates to deprive him of his Fourth Amendment privacy rights. *Id.* at 1290 (search invalidated when suspect's purse was seized and kept exclusively within police custody, but was not searched until some time after her arrest) ("searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest [citations omitted]"); *see also, United States v. Chadwick,* 433 U.S. 1, 14, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) ("Though surely a substantial infringement of respondents' use and possession, the seizure [of their footlocker after they had been arrested] did not diminish respondents' legitimate expectation that the footlocker's contents would remain private"); *United States v. Schleiss,* 582 F.2d 1166 (8th Cir.1978) (arrestee did not relinquish expectation of privacy in briefcase despite police seizure of it).

What the record demonstrates is that the arresting officers saw money protruding from Lynette's bag, but were more concerned about the wallet she pulled from it, and searched the contents of the purse only after they arrived at the stationhouse. The following citations are illustrative.

The officer who apprehended Lynette testified not that he searched the purse, but rather that he saw money coming out of the purse and then seized it.

Q. Officer Williamson, I believe you've indicated that you then [when Lynette turned to withdraw identification from her purse] moved your location so that you might see the purse. Would you tell us then what you observed?

A. She was drawing something—small and black—out of the purse; I couldn't see what. Several bills—different denominations of money—could be seen coming out of the purse, as her hand was moving out of the purse.

Q. Would you describe a little more fully the currency that you were seeing at that time.

A. Money—I don't remember the exact denomination of the bills that I saw coming out, but there—you know—money was—the purse was obviously stuffed. And, as she was trying to take her hand out of the purse, some money was protruding out. I didn't pay much attention to it at the time. I was more concerned with what was in her hand than what she was going to bring out of her purse.

Q. What did you do then, after you made these observations?

A. It happened fast—what she was taking out of the purse was a wallet. I took the purse and wallet from her. At this time another officer—Officer Strickland—had come to my side. I handed him the purse. Miss Burnette was under arrest. I handcuffed her.

R.T. at 144–45. Officer Williamson said nothing else about the purse on direct examination at the suppression hearing. Indeed, his responses to questions on cross and redirect examinations reveal his lack of knowledge about the contents of the purse. On cross, defense counsel focused on Lynette's opportunity to have withdrawn identification from the purse, but did not ask Officer Williamson whether he knew what was in it:

Q. What did she try to pull out of her purse?

A. I have no idea, at that time, sir.

Q. Did you see what she was trying to pull out of her purse?

A. No, sir.

Q. Okay. Did you take the purse away from her before you could see what it was she tried to pull out of her purse?

A. Something was coming out of her purse; I thought it wise to take the purse away from her.

Q. Okay. You didn't want to see what was coming out of the purse; you just took it away from her. Am I correct?

A. Yes, sir.

R.T. at 157–58. Other testimony by Officer Williamson confirms that he did not himself

conduct a more thorough examination of the purse.

Q. Officer, you asked her to produce some identification, and she said she had it in her purse, didn't she?

A. Uh-huh.

Q. And when she went to open the purse, you took it away from her, didn't you?

A. No, sir.

Q. Wait a minute; let me back up. Did you just tell me that when she went to open the purse and extract something out of it, you took the purse away from her?

A. Yes, sir.

Q. In response to the prosecutor's questions, I think you testified that—we . . . strike that.

Have. you—do you have a copy of your report with you?

A. No, sir, I don't.

Q. Okay. Do you recall putting this in your report—and I'm referring to—would you like to see it, see a copy of it?

A. Yes.

. . . .

Q. Would you read [the second to the last paragraph] to the Court, please, sir.

. . . .

A. As she was doing this, Officer Strickland arrived on the scene and assisted me with the subject. He removed the purse from her as I was taking the wallet identification from her. Officer Strickland . . . continued to open the purse, and it was found to contain a large sum of money.

MR. FREY: Okay. I have no further questions.

R.T. at 158, 160. The record thus makes clear that Officer Strickland was the sole policeman who investigated the contents of the purse at the time of the arrest. Although Officer Strickland's direct testimony at the suppression hearing confirmed that Officer Williamson had done no more than pass Lynette's purse to him, it did nothing to suggest the extent of the search he himself conducted at that time.

Q. [Who had the purse?]

A. It was—the purse was either sitting on the ground or he had it in his hands. I do not recall specifically where it was. But I was given the purse by Officer Williams [sic] shortly after my arrival there.

Q. All right. Did Officer Williamson hand you any identification?

A. Yes, he did.

Q. Was the identification already removed from the purse when he handed it to you?

A. Yes, sir.

Q. Were you present when Officer Williamson got that identification from wherever it was that he got it?

A. When I got there, it was in his hand. I do not know where he got it from.

Q. Was the purse open or closed when you got there?

A. It was closed.

Q. What did you do when he gave you the purse?

A. He handed me the purse and explained to me how he had come by it; and I asked him if anyone had looked in the purse, and he stated "No." At that time, I unzipped the purse and opened it.

Q. Have you got a copy of your report available to you, sir?

A. Right now, no.

R.T. at 167–68.

The government's attorney asked no further questions about the evidence Officer Strickland had uncovered during that preliminary investigation. The suppression hearing was thus concluded without providing support for an assumption that anything more than a seizure of the purse had occurred. Testimony at the trial itself did not suggest otherwise. Officer Williamson again disclaimed any action save the seizure of the purse, both on direct and redirect examinations.

DIRECT

Q. Officer Williamson, you have indicated, I think, that this identification came from a purse. Did you then seize the purse from this person?

A. I took the purse from her after she had begun to open the purse and then closed it. She then stood up and turned her back to me and began to open the purse again. She was withdrawing something from the purse, and at that point I took the purse from her.

. . . .

REDIRECT

Q. Officer Williamson, the purse that you took from Lynette Burnette on that date, what, if anything, did you do with it at that time? To whom did you give it, if to anyone?

A. When I took the purse from her, I handed it to Officer Strickland.

Q. Thank you. I have nothing further.

R.R. at 305, 316. At the trial, Officer Strickland merely identified the purse and described the search done at the stationhouse: he did not further elaborate on his actions at the time of the arrest. Thus, when asked whether he recognized an exhibit that had just been introduced, he replied:

A. Yes. That is the purse I was given custody of by Officer Williamson.

Q. Is there any way that you can recognize it as the same purse?

A. When I placed this purse in departmental property, I put it inside the bag and stapled the bag shut. I also stapled onto it the property tag that is made out in my handwriting.

R.T. at 319. His only other relevant testimony revealed the following:

Q. Officer Strickland, did you later that day take the purse that you had seized to the police department?

A. Yes, sir.

Q. Did you at that time do anything with it?

A. After we had been there for a short period of time, I removed a large amount of money from the purse and began to break it into different piles by denomination. And these piles were later counted.

Q. Did you make a count of all of the currency found therein?

A. Yes, sir, I did.

Q. Do you know what the total amount of the currency was?

A. It was right around $5,700. I don't remember the exact amount.

. . . .

Q. Was anyone there with you at the time that you were inventorying the currency?

A. Officer Aleshire was sitting at a desk.

Q. What was he doing?

A. He was going through the stack of twenty-dollar bills looking for specifically serial-numbered twenty-dollar bills.

Q. Do you know whether or not he found any?

A. He found some of them, yes, sir.

Q. No additional questions.

R.T. at 325–27.

These interchanges represent the sum total of record evidence on what occurred when the purse was seized immediately subsequent to Lynette's arrest. This meager record and the parties' inability to understand the issue even when explicitly asked to address it demonstrate the risks inherent in deciding this question *sua sponte.* In my view, the record in its present state simply does not support the majority's treatment of the issue of the admissibility of the evidence of the contents of Lynette's purse discovered during the search at the police station.